## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

RICHARD PRATT and LARRY JONES,
individually and on behalf of all others
similarly situated,                           Case No. 21-cv-11404-TLL-PTM

      Plaintiffs,

vs.

KSE SPORTSMAN MEDIA, INC. D/B/A
OUTDOOR SPORTSMAN GROUP,

      Defendant.

## DEFENDANT KSE SPORTSMAN MEDIA, INC. D/B/A OUTDOOR
## SPORTSMAN GROUP, INC.'S
## ANSWER TO PLAINTIFFS' CLASS ACTION COMPLAINT

Defendant KSE Sportsman Media, Ind., d/b/a Outdoor Sportsman Group,

("OSG")[1] hereby answers Plaintiffs' Class Action Complaint as follows:

### INTRODUCTION

1.     Defendant Outdoor Sportsman Group, Inc. ("OSG") rented, exchanged,

and/or otherwise disclosed detailed information about Plaintiffs' *Guns & Ammo,*

---

[1] Plaintiff's Complaint named Outdoor Sportsman Group, Inc. as Defendants in this action. The correct name is KSE Sportsman Media, Inc., d/b/a Outdoor Sportsman Group. On January 25, 2022, the Court directed the Clerk to amend the case caption to reflect that the Defendant's correct name is "KSE Sportsman Media, Inc. d/b/a Outdoor Sportsman Group."

*Rifle Shooter, and Handguns* magazines subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed their information to aggressive advertisers, political organizations, and non-profit companies. As a result, Plaintiffs have received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiffs' Private Reading Information (defined below) during the relevant pre-July 30, 2016 time period, OSG violated Michigan's Video Rental Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), id. § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "VRPA").[2]

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegation that Plaintiffs "received a barrage of unwanted junk mail" and therefore denies the same. OSG denies that it violated the VRPA. OSG denies any remaining allegations contained in Paragraph 1.

2. Documented evidence confirms these facts. For example, a list broker, NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "OUTDOOR SPORTSMAN GROUP INC. MASTERFILE Mailing List",

---

[2] OSG does not include the numerous footnotes or headers contained in the Class Action Complaint. To the extent that any answer is required to the footnotes, OSG states that the materials cited and referenced in the footnotes speak for themselves. OSG lacks information sufficient to admit or deny the statements contained in the cited and referenced materials in the footnotes and therefore denies the same. OSG denies any remaining allegations contained in the footnotes or headers in the Class Action Complaint.

20587886v1

which contains the Private Reading Information of 798,422 of OSG's active U.S.

subscribers at a base price of "$100.00/M [perthousand]," (i.e., 10 cents apiece), as

shown in the screenshot below:



**OUTDOOR SPORTSMAN GROUP INC. MASTERFILE**
**Mailing List**

Formerly known as: Intermedia Outdoors Inc. Group Masterfile. A combined and unduplicated masterfile of active subscribers of Outdoor Sportsman Group Inc. 15 outdoor titles, which are Bowhunter, Bowhunting, Florida Sportsman, Fly Fisherman, Game & Fish, Gun Dog, Gun and Ammo, Handguns, Hunting, In-Fisherman, North American Whitetail, Rifleshooter, Shooting Times, Shotgun News, and Wildfowl. This group of enthusiasts is interested in technique, equipment, instruction, and such related activities pertaining to their love of the outdoors. These sportsmen prove their dedication through their considerable expenditure of time and money in pursuit of their chosen outdoor activity whether it be hunting or fishing.

Get Count    Get Pricing    Get More Information

| SEGMENTS | COUNTS THROUGH 03/31/2021 |
|---|---|
| 798,422 TOTAL UNIVERSE / BASE RATE | $100.00/M |
| 77,485 1 MONTH HOTLINE | + $21.00/M |
| 277,180 3 MONTH HOTLINE | + $16.00/M |
| 423,166 6 MONTH HOTLINE | + $11.00/M |
| 798,422 ACTIVE SUBSCRIBERS | $100.00/M |
| 198,982 12 MONTH EXPIRES | $75.00/M |
| 7,708 CANADIAN SUBSCRIBERS | $115.00/M |
| NON-RECIPROCAL | + $25.00/M |
| NON-ENDEMIC CATALOG | $85.00/M |
| FUNDRAISER | $85.00/M |
| COUNTS THRU 03/31/2021 | |

| | |
|---|---|
| POPULARITY: | ●●●●● 100 |
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | 100% DIRECT MAIL |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| | CANADA |
| GENDER: | 14% FEMALE 86% MALE |

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $21.00/M |
| 3 MONTH HOTLINE | $16.00/M |
| 6 MONTH HOTLINE | $11.00/M |
| ACTIVE SUBSCRIBERS | |
| AGE | $11.00/M |
| AREA OF INTEREST | $16.00/M |
| CANADIAN | |
| CHANGE OF ADDRESS | $11.00/M |
| CONTRIBUTORS/DONORS | $11.00/M |
| CREDIT CARDS | $11.00/M |
| FOREIGN/INTERNATIONAL | |
| FORMER/EXPIRED SUBS | |
| GENDER/SEX | $11.00/M |
| HOME BUSINESS/SOHO | $16.00/M |
| HOME OWNER | $11.00/M |
| HUNTING AND/OR FISHING LICENSES | $10.00/M |
| INCOME SELECT | $11.00/M |
| LIFESTYLE | $16.00/M |
| MAIL ORDER BUYERS | $11.00/M |
| MARITAL STATUS | $11.00/M |
| OCCUPATION | $11.00/M |

**DESCRIPTION**

(FORMERLY: Primedia Outdoors Inc Group Master File

InterMedia Outdoors Inc. Group Masterfile)

A combined and unduplicated masterfile of active subscribers of Outdoor Sportsman Group Inc. 15 outdoor titles, which are Bowhunter, Bowhunting, Florida Sportsman, Fly Fisherman, Game & Fish, Gun Dog, Guns and Ammo, Handguns, Hunting, In- Fisherman, North American Whitetail, Rifleshooter, Shooting Times, Firearms News, and Wildfowl. This group of enthusiasts is interested in technique,

*See* **Exhibit A** hereto.

> **ANSWER:** OSG lacks knowledge or information sufficient to admit or deny
>
> the contents of and allegations regarding Exhibit A and therefore denies the

allegations purporting to describe those contents. OSG denies any remaining allegations contained in Paragraph 2.

3.    By renting, exchanging, or otherwise disclosing the Private Reading Information of its Michigan-based subscribers during the relevant pre-July 30, 2016 time period, OSG violated the VRPA. Subsection 2 of the VRPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials ... shall not disclose to any person, other than the customer, a record or information concerning the purchase ... of those materials by a customer that indicates the identity of the customer.

VRPA § 2.

**ANSWER:** OSG denies the allegations contained in Paragraph 3.

4.    Accordingly, Plaintiffs bring this Class Action Complaint against OSG for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the VRPA.

**ANSWER:** OSG admits that Plaintiffs purport to bring a class action complaint under the VRPA but OSG denies that it violated the VRPA and denies it has any liability under that statute and further denies any remaining allegations in Paragraph 4.

20587886v1

## <u>NATURE OF THE CASE</u>

5.     To supplement its revenues, OSG rents, exchanges, or otherwise discloses its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as age, gender, income, marital status, occupation, and hunting license status—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.

**<u>ANSWER</u>:** OSG denies the allegations contained in Paragraph 5.

6.     By renting, exchanging, or otherwise disclosing - rather than selling - its customers' Private Reading Information, OSG is able to disclose the information time and time again to countless third parties.

**<u>ANSWER</u>:** OSG denies the allegations contained in Paragraph 6.

7.     OSG's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society - and, as it relates to OSG's subscribers in particular, allows for the identification of individuals who are likely to possess firearms and the addresses where they reside (and where their guns would be stored). For example, anyone could buy a customer list provided by OSG that contains the names and addresses of all women *Guns & Ammo* subscribers who

20587886v1

are over the age of 40, possess a hunting license, and make over $80,000.00 per year. Such a list is available for sale on the open market for approximately $143.00 per thousand subscribers listed.

**ANSWER:** OSG denies that it acted unlawfully. OSG lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 7 and, on that basis, denies them.

8.     While OSG profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the VRPA) because OSG does not obtain its customers' written consent prior to disclosing their Private Reading Information.

**ANSWER:** OSG denies the allegations contained in Paragraph 8.

## PARTIES

9.     Plaintiff Richard Pratt is a natural person who is a citizen of the State of Michigan and resides in Gladwin, Michigan. Plaintiff Pratt was a subscriber to *Guns & Ammo, Rifle Shooter*, and *Handguns* magazines, including during the relevant pre-July 30, 2016 time period. *Guns & Ammo, Rifle Shooter*, and Handguns magazines are published by OSG. While residing in, a citizen of, and present in Michigan, Plaintiff Pratt purchased his subscriptions to *Guns & Ammo, Rifle Shooter*, and *Handguns* magazines directly from OSG. Prior to and at the time

6

Plaintiff Pratt subscribed to *Guns & Ammo, Rifle Shooter*, and *Handguns*, OSG did not notify Plaintiff Pratt that it discloses the Private Reading Information of its customers, and Plaintiff Pratt has never authorized OSG to do so. Furthermore, Plaintiff Pratt was never provided any written notice that OSG rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. Since subscribing to *Guns & Ammo, Rifle Shooter*, and *Handguns*, and during the relevant pre-July 30, 2016 time period, OSG disclosed, without the requisite consent or prior notice, Plaintiff Pratt's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, OSG rented or exchanged mailing lists containing Plaintiff Pratt's Private Reading Information to third parties seeking to contact OSG subscribers, without first obtaining the requisite written consent from Plaintiff Pratt or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

**ANSWER:**  OSG lacks information or knowledge sufficient to admit or deny the allegations related to Plaintiff Pratt's citizenship and residence and therefore denies the same. OSG admits that it publishes the magazines, *Guns & Ammo*, *Rifle Shooter*, and *Handguns*. OSG admits that Plaintiff Pratt subscribed at some point to the foregoing magazines and, therefore, had notice of, and consented to, disclosure of certain subscriber information. Accordingly, OSG denies that Plaintiff Pratt did

not have the requisite consent or prior notice. Furthermore, unless expressly admitted, OSG denies all remaining allegations contained in Paragraph 9.

10. Plaintiff Larry Jones is a natural person who is a citizen of the State of Michigan and resides in Flint, Michigan. Plaintiff Jones was a subscriber to *Guns & Ammo* magazine, including during the relevant pre-July 30, 2016 time period. *Guns & Ammo* magazine is published by OSG. While residing in, a citizen of, and present in Michigan, Plaintiff Jones purchased his subscription to *Guns & Ammo* magazine directly from OSG. Prior to and at the time Plaintiff Jones subscribed to *Guns & Ammo*, OSG did not notify Plaintiff Jones that it discloses the Private Reading Information of its customers, and Plaintiff Jones has never authorized OSG to do so. Furthermore, Plaintiff Jones was never provided any written notice that OSG rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. Since subscribing to *Guns & Ammo*, and during the relevant pre-July 30, 2016 time period, OSG disclosed, without the requisite consent or prior notice, Plaintiff Jones's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, OSG rented or exchanged mailing lists containing Plaintiff Jones's Private Reading Information to third parties seeking to contact OSG subscribers, without first obtaining the requisite written

8

consent from Plaintiff Jones or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

**ANSWER:**  OSG lacks information or knowledge sufficient to admit or deny the allegations related to Plaintiff Jones' citizenship and residence and therefore denies the same. OSG admits that it publishes the magazine, *Guns & Ammo*. OSG admits that Plaintiff Pratt subscribed at some point to the foregoing magazine and, therefore, had notice of, and consented to, disclosure of certain subscriber information. Accordingly, OSG denies that Plaintiff Pratt did not have the requisite consent or prior notice. Furthermore, unless expressly admitted, OSG denies all remaining allegations contained in Paragraph 10.

11.    Defendant Outdoor Sportsman Group, Inc. is a Colorado corporation with its headquarters and principal place of business in New York, New York. OSG does business throughout Michigan and the entire United States. OSG is the publisher of the magazines *Firearm News, Rifleshooter, Shooting Times, Hunting, In-Fisherman*, and *Game & Fish*, as well as its flagship publication *Guns & Ammo* magazine.

**ANSWER:** OSG admits that KSE Sportsman Media, Inc. d/b/a Outdoor Sportsman Group is incorporated under the laws of Delaware with a place of business in Denver, Colorado. OSG admits that it publishes certain magazines, including *Firearm News, Rifleshooter, Shooting Times, Hunting, In-Fisherman,*

9

*Game & Fish*, and *Guns & Ammo*. OSG denies any remaining allegations in Paragraph 11.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

**ANSWER:** The allegations in Paragraph 12 state legal conclusions to which no response is required. To the extent that a response is required, OSG lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 12 and on that basis, denies them.

13.     The Court has personal jurisdiction over OSG because Plaintiffs' claims arose in substantial part from actions and omissions in Michigan, including from Plaintiffs' purchases of *Guns & Ammo, Rifle Shooter*, and *Handguns* magazines subscriptions in Michigan, OSG's direction of such *Guns & Ammo, Rifle Shooter*, and *Handguns* magazines subscriptions into Michigan, and OSG's failure to obtain Plaintiffs' written consent in Michigan prior to disclosing their Private Reading Information, including their residential addresses in Michigan, to another person, the effects of which were felt from within Michigan by citizens and residents of Michigan. Personal jurisdiction also exists over OSG in Michigan because OSG

10

conducts substantial business within Michigan, such that OSG has significant, continuous, and pervasive contacts with the State of Michigan.

**ANSWER:** OSG does not contest the Court's exercise of personal jurisdiction over it. To the extent that the allegations in Paragraph 13 state a legal conclusion, no response is required. OSG denies any remaining allegations in Paragraph 13.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because OSG does substantial business in this judicial District and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District.

**ANSWER:** OSG does not dispute that venue for this dispute is proper in this Court. To the extent the allegations in Paragraph 14 state legal conclusions, no response is required. OSG denies any remaining allegations in Paragraph 14.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

15.    In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."

20587886v1

S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

**ANSWER:** OSG refers to the cited document, which speaks for itself as to its complete and actual contents. OSG lacks information sufficient to admit or deny the truth of the statements contained in the cited document and therefore denies the same. OSG denies any remaining allegations in Paragraph 15.

16.    Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the VRPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

**ANSWER:** OSG refers to the cited document, which speaks for itself as to its complete and actual contents. OSG lacks information sufficient to admit or deny the truth of the statements contained in the cited document and therefore denies the same. OSG denies any remaining allegations in Paragraph 16.

17.    Subsection 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase ... of those materials by a customer that indicates the identity of the customer.

VRPA § 2 (emphasis added).

**ANSWER:** OSG refers to the cited document, which speaks for itself as to its complete and actual contents. OSG denies any remaining allegations in Paragraph 17.

18.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100-599, at 6 (Statement of Rep. McCandless).

**ANSWER:** OSG refers to the cited document, which speaks for itself as to its complete and actual contents. OSG lacks information sufficient to admit or deny the truth of the statements contained in the cited document and therefore denies the same. OSG denies any remaining allegations in Paragraph 18.

19.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

**ANSWER:** OSG refers to the cited document, which speaks for itself as to its complete and actual contents. OSG lacks information sufficient to admit or deny the truth of the statements contained in the cited document and therefore denies the same. OSG denies any remaining allegations in Paragraph 19.

20.    Senator Leahy also explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

**ANSWER:** OSG refers to the cited document, which speaks for itself as to its complete and actual contents. OSG lacks information sufficient to admit or deny the truth of the statements contained in the cited document and therefore denies the same. OSG denies any remaining allegations in Paragraph 20.

21.    Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

20587886v1

**ANSWER:** The allegations in Paragraph 21 contain legal conclusions to which no response is required. OSG refers to the cited document, which speaks for itself as to its complete and actual contents. OSG lacks information sufficient to admit or deny the truth of the statements contained in the cited document and therefore denies the same. OSG denies any remaining allegations in Paragraph 21.

22.    Despite the fact that thousands of Michigan residents subscribe to OSG's publications, OSG disregarded its legal responsibility by systematically violating the VRPA.

**ANSWER:** OSG denies the allegations in paragraph 22.

23.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 23 and therefore denies the same.

24.    More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.

20587886v1

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 24 and therefore denies the same.

25.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 25 and therefore denies the same.

26.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 26 and therefore denies the same.

27.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 27 and therefore denies the same.

28.   Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 28 and therefore denies the same.

29.   Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 29 and therefore denies the same.

30.   In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 30 and therefore denies the same.

20587886v1

31.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like OSG share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.

**ANSWER:** OSG denies that it violated the VRPA or engaged in any other wrongdoing.  OSG lacks information sufficient to admit or deny the truth of the remaining allegations in paragraph 31 and therefore denies the same.

32.    Information disclosures like those made by OSG are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."

18

**ANSWER:** OSG denies that it violated the VRPA or engaged in any other wrongdoing.  OSG lacks information sufficient to admit or deny the truth of the remaining allegations in paragraph 32 and therefore denies the same.

33.    Indeed, an entire black market exists while the private information of vulnerable elderly Americans is exchanged. Thus, information disclosures like OSG's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."

**ANSWER:** OSG denies that it violated the VRPA or engaged in any other wrongdoing.  OSG lacks information sufficient to admit or deny the truth of the remaining allegations in paragraph 33 and therefore denies the same.

34.    OSG is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

**ANSWER:** OSG denies that it violated the VRPA or engaged in any other wrongdoing.  OSG lacks information sufficient to admit or deny the truth of the remaining allegations in paragraph 34 and therefore denies the same.

35.    Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately

19

for consumers, this growth has come at the expense of their most basic privacy rights.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations contained in Paragraph 35 and therefore denies the same.

36.    As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations contained in Paragraph 36 and therefore denies the same.

37.    A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 37 and therefore denies the same.

38.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

20587886v1

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations contained in Paragraph 38 and therefore denies the same.

39.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 39 and therefore denies the same.

40.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their private data.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 40 and therefore denies the same.

41.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.

**ANSWER:** OSG lacks information sufficient to admit or deny the truth of the allegations in paragraph 41 and therefore denies the same.

42.     OSG maintains a vast digital database comprised of its customers' Private Reading Information. OSG discloses its customers' Private Reading

21

Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each OSG customer, including his or her age, gender, income, marital status, occupation, and hunting license status. (*See*, *e.g.*, **Exhibit A**).

**ANSWER:** OSG admits that it has a database containing certain information about its subscribers and that some subscriber information may be disclosed to cooperative databases with prior notice to and consent by its subscribers. OSG lack knowledge or information sufficient to form a belief as to whether these are "data aggregators" or "appenders" and therefore denies the same. OSG also lacks knowledge or information sufficient to form a belief as to whether such cooperative databases supplement the alleged "Private Reading Information" or with what additional information, and therefore denies the same. OSG denies any remaining allegations in Paragraph 42.

43.    OSG then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

**ANSWER:** OSG admits that it rents and/or exchanges certain mailing lists that may including subscribers' information, which is done with prior notice to and consent by its subscribers, but lacks knowledge or information sufficient to form a belief as to what, if any, additional information was included, and therefore denies this allegation. OSG denies any remaining allegations in Paragraph 43.

44.     OSG also discloses its customers' Private Reading Information to data cooperatives, who in turn give OSG access to their own mailing list databases.

**ANSWER:** OSG admits that it discloses certain subscriber information, which is done with prior notice to and consent of its subscribers. OSG denies any remaining allegations in Paragraph 44.

45.     As a result of OSG's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from OSG that identify OSG's customers by their most intimate details such as their age, gender, income, marital status, occupation, and hunting license status. OSG's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers, and it puts those who own firearms at risk of home break-ins, robberies, violent crime, and other evils.

**ANSWER:** OSG lacks knowledge or information sufficient to admit or deny truth of the allegations in Paragraph 45 and therefore denies the allegations in Paragraph 45.

20587886v1

46.     OSG does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive private information is being rented and exchanged on the open market.

**ANSWER:** OSG denies the allegations in Paragraph 46.

47.     Consumers can sign up for subscriptions to OSG's publications through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, OSG never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period. Consequently, during the relevant pre-July 31, 2016 time period, OSG uniformly failed to obtain any form of consent from - or even provide effective notice to - its customers before disclosing their Private Reading Information.

**ANSWER:** OSG admits there are various ways and outlets through which individuals can obtain subscriptions to OSG's publications. OSG denies the remaining allegations in Paragraph 47.

48.     As a result, OSG disclosed its customers' Private Reading Information - including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns" - to anybody willing to pay for it.

**ANSWER:** OSG denies that it violated the VRPA or engaged in any other wrongdoing. OSG lacks information sufficient to admit or deny the truth of the remaining allegations in paragraph 48 and therefore denies the same.

49.    By and through these actions, OSG has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the VRPA.

**ANSWER:** OSG denies the allegations contained in Paragraph 49.

## CLASS ACTION ALLEGATIONS

50.    Plaintiffs seek to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 30, 2016 time period, had their Private Reading Information disclosed to third parties by OSG without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

**ANSWER:** The allegations contained in Paragraph 50 state legal conclusions to which no response is required. To the extent a response is required, OSG admits Plaintiffs purport to bring this lawsuit as a class action on behalf of the class described in Paragraph 50, but OSG denies this action meets the class certification requirements. OSG further denies any remaining allegations in Paragraph 50.

51.    Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in

20587886v1

the thousands. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

**ANSWER:**  OSG denies the allegations in Paragraph 51.

52.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether OSG is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether OSG obtained consent before disclosing to third parties Plaintiffs' and the Class's Private Reading Information; and (c) whether OSG's disclosure of Plaintiffs' and the Class's Private Reading Information violated the VRPA.

**ANSWER:**  OSG denies the allegations in Paragraph 52.

53.    The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the VRPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiffs' and the Class's Private Reading Information.

**ANSWER:**  OSG denies the allegations in Paragraph 53.

54.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

**ANSWER:** OSG denies the allegations in Paragraph 54.

55.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**ANSWER:** OSG denies the allegations in Paragraph 55.

20587886v1

**CAUSE OF ACTION**
**Violation of Michigan's Video Rental Privacy Act**
**(VRPA § 2)**

56.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER:**  OSG incorporates its responses to Paragraphs 1-55 as if fully set forth herein.

57.     Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant OSG.

**ANSWER:** OSG admits that Plaintiffs to purport bring this claim individually and on behalf of the putative class, but denies that this action should be certified as a class action and denies any remaining allegations in Paragraph 57.

58.     As a magazine publisher that sells subscriptions to consumers, OSG is engaged in the business of selling written materials at retail. *See* VRPA § 2.

**ANSWER:** The allegations contained in Paragraph 58 contain legal conclusions to which no response is required. To the extent a response is required, OSG admits that it sells subscriptions to consumers but denies that it violated the VRPA or engaged in any wrongdoing, and further denies any remaining allegations in Paragraph 58.

20587886v1

59.    By purchasing subscriptions to *Guns & Ammo*, *Rifle Shooter*, and *Handguns* magazines, Plaintiffs purchased written materials directly from OSG. *See* VRPA § 2.

**ANSWER:** OSG admits the allegations of Paragraph 59.

60.    Because Plaintiffs purchased written materials directly from OSG, they are "customers" within the meaning of the VRPA. *See* VRPA § 1.

**ANSWER:** The allegations contained in Paragraph 60 contain legal conclusions to which no response is required. To the extent a response is required, OSG refers to the VRPA which speaks itself. OSG lacks information sufficient to admit or deny whether Plaintiffs meet the definition of "customers" under the meaning of the VRPA and, on that basis, denies the allegations in Paragraph 60.

61.    At various times during the pre-July 30, 2016 time period, OSG disclosed Plaintiffs' Private Reading Information, which identified them as *Guns & Ammo, Rifle Shooter*, and/or *Handguns* magazines customers, in at least three ways.

**ANSWER:** Paragraph 61 is incomplete in that it does not identify "at least three ways" and on that basis, OSG lacks knowledge or information sufficient to admit or deny the truth of the allegations in this Paragraph 61, and on that basis OSG denies the allegations in Paragraph 61.

62.    First, OSG disclosed mailing lists containing Plaintiffs' Private Reading Information to data aggregators and data appenders, who then

supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to OSG.

**ANSWER:** OSG admits that it has a database containing certain information about its subscribers and that some subscriber information may be disclosed to cooperative databases with prior notice to and consent by its subscribers. OSG lack knowledge or information sufficient to form a belief as to whether these are "data aggregators" or "appenders" and therefore denies the same. OSG also lacks knowledge or information sufficient to form a belief as to whether such cooperative databases supplement the alleged "Private Reading Information" or with what additional information, and therefore denies the same. OSG denies any remaining allegations in Paragraph 62.

63.    Second, OSG disclosed mailing lists containing Plaintiffs' Private Reading Information to data cooperatives, who in turn gave OSG access to their own mailing list databases.

**ANSWER:** OSG admits that it discloses certain subscriber information with prior notice to and consent of its subscribers and that cooperative databases may provide access to their mailing list databases. Unless expressly admitted, OSG denies any remaining allegations in Paragraph 63.

64.    Third, OSG rented and/or exchanged its mailing lists containing Plaintiffs' Private Reading Information—enhanced with additional information

from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

**ANSWER:** OSG admits that it rents or exchanges certain subscriber information with prior notice to and consent of its subscribers. Unless expressly admitted, OSG denies any remaining allegations in Paragraph 64.

65.    Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and OSG was able to increase its profits gained from the mailing list rentals and/or exchanges.

**ANSWER:** OSG admits that certain mailing lists may be more valuable in certain circumstances, but OSG lacks knowledge or information sufficient to admit or deny the value of the alleged mailing lists in relationship to profits, and on that basis, OSG denies the allegations contained in Paragraph 65.

66.    By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 30, 2016 time period, OSG disclosed to persons other than Plaintiffs records or information concerning their purchase of written materials from OSG. *See* VRPA § 2.

**ANSWER:** OSG admits that it disclosed certain subscriber information during the period of June 16, 2015 to July 30, 2016, with prior notice to and consent

of its subscribers. OSG denies that such disclosure or any other act or omission by OSG violated the VRPA, and on that basis denies the allegations in Paragraph 66.

67.    The information OSG disclosed indicates Plaintiffs' names and addresses, as well as the fact that they subscribed to *Guns & Ammo, Rifle Shooter*, and/or *Handguns* magazines. Accordingly, the records or information disclosed by OSG indicated Plaintiffs' identities. *See* VRPA § 2.

**ANSWER:**  OSG admits that it disclosed certain subscriber information, with prior notice to and consent of its subscribers. OSG denies that such disclosure or any other act or omission by OSG violated the VRPA, and on that basis denies the allegations in Paragraph 67.

68.    Plaintiffs and the members of the Class never consented to OSG disclosing their Private Reading Information to anyone.

**ANSWER:**  OSG denies the allegations contained in Paragraph 68.

69.    Worse yet, Plaintiffs and the members of the Class did not receive notice before OSG disclosed their Private Reading Information to third parties.

**ANSWER:**  OSG denies the allegations contained in Paragraph 69.

70.    OSG's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 30, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

**ANSWER:**  OSG admits the allegations contained in Paragraph 70.

20587886v1

71.     OSG's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 30, 2016 time period were not made to collect payment for their subscriptions.

**ANSWER:**  OSG denies the allegations contained in Paragraph 71.

72.     OSG's disclosures of Plaintiffs' Private Reading Information during the relevant pre-July 30, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase OSG's revenue. Accordingly, OSG's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

**ANSWER:**  OSG denies the allegations contained in Paragraph 72.

73.     By disclosing Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 30, 2016 time period, OSG violated Plaintiffs' and the Class's statutorily protected right to privacy in their reading habits. *See* VRPA § 2.

**ANSWER:**  OSG denies the allegations in Paragraph 73.

74.     As a result of OSG's unlawful disclosure of their Private Reading Information, Plaintiffs and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the VRPA). On behalf of themselves and the Class, Plaintiffs seek: (1) an injunction requiring Defendant OSG to obtain consent from Michigan customers prior to the disclosure of their Private

Reading Information as required by the VRPA; (2) $5,000.00 per Class member pursuant to VRPA § 5(a); and (3) costs and reasonable attorneys' fees pursuant to VRPA § 5(b).

**ANSWER:** OSG denies the allegations in Paragraph 74.

## REQUEST FOR RELIEF

WHEREFORE, OSG respectfully requests that the Court enter an order:

(i)     Dismissing Plaintiffs' complaint with prejudice;

(ii)    Awarding OSG its costs and attorneys' fees in defending this action; and

(iii)   Granting such further relief to OSG as the Court deems just and proper.

## GENERAL DENIAL

To the extent any of the foregoing allegations are not specifically admitted, each is hereby denied.

## ADDITIONAL DEFENSES

OSG asserts the following affirmative defenses and reserves its right to amend its answer to assert any additional affirmative defenses when and if, in the course of its investigation, discovery or preparation for trial, it becomes appropriate to assert such affirmative defenses. In asserting these defenses, OSG does not assume the burden of proof for any issue that would otherwise rest on Plaintiffs.

20587886v1

1.      Plaintiffs' claims are barred, in whole or in part, for failure to state a claim upon which relief can be granted.

2.      Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

3.      Plaintiffs' claims are barred, in whole or in part, for failure to mitigate their alleged damages.

4.      Plaintiffs' claims are barred, in whole or in party, because OSG did not cause their alleged damages.

5.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches, estoppel, unclean hands, assumption of risk, and/or waiver.

6.      Plaintiffs' claims are barred because they are not proper class representatives.

7.      Plaintiffs' claims are barred because they have not suffered any actual damages as a result of any of the matters alleged in the complaint.

8.      Plaintiffs and/or others alleged to be members of the putative class lack standing under Article III of the United States Constitution to assert the claims stated in the Class Action Complaint and to seek some and/or all of the relief requested.

9.      Plaintiffs' claims are barred in whole or in part because they had prior notice of and consented to any alleged disclosure of their alleged "Private Reading Information."

20587886v1

10.     OSG breached no duty, contractual or otherwise, owned to Plaintiffs.

11.     The complained of disclosures, if any, meet the VRPA's or Amended VRPA's exceptions.

12.     The VRPA and all requested relief in this lawsuit violate the First Amendment of the United States Constitution.

13.     The VRPA and all requested relief in this lawsuit violate Article I, Section 5 of the Constitution of Michigan.

14.     This action cannot properly be brought as a class action because the requirements of Federal Rule of Civil Procedure 23 for certification of a class are not met and cannot be met in this action.

15.     The damages alleged, if any, were caused by Plaintiffs' own fault or by the fault of non-parties.

16.     Plaintiffs' claims are barred, in whole or in part, by their assumption of risk.

17.     Plaintiffs are not entitled to recover attorneys' fees.

18.     OSG reserves the right to assert additional defenses as may be identified during the course of discovery or trial.

20587886v1

Dated: March 1, 2022                    Respectfully submitted,

                                        */s/ Anthony C. Sallah*
                                        Jennifer Stocker (P60625)
                                        Anthony C. Sallah (P84136)
                                        **BARNES & THORNBURG LLP**
                                        171 Monroe Avenue N.W., Suite 1000
                                        Grand Rapids, MI 49503
                                        (616) 742-3932
                                        jstocker@btlaw.com
                                        asallah@btlaw.com

                                        Todd G. Vare
                                        **BARNES & THORNBURG LLP**
                                        11 South Meridian Street
                                        Indianapolis, Indiana 46204
                                        T: (317) 231-7735
                                        F: (317) 231-7433
                                        tvare@btlaw.com

                                        *Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 1, 2022 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's filing system.

*/s/ Anthony C. Sallah*
*One of the Attorneys for Defendant*

20587886v1