# Exhibit B

HaqWedwCredacted

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JOSEPHINE JAMES EDWARDS,
     Individually, and on Behalf of
 4   All Others Similarly Situated,

 5              Plaintiff,

 6         v.                          15 Civ. 9279 (AT)(JLC)

 7
     HEARST COMMUNICATIONS, INC.,
 8                                     Conference

 9              Defendant.

10   ------------------------------x
                                       New York, N.Y.
11                                     October 26, 2017
                                       3:45 p.m.
12
     Before:
13
                     HON. JAMES L. COTT,
14
                                       Magistrate Judge
15

16                    APPEARANCES

17   BURSOR & FISHER, P.A.
          Attorneys for Plaintiff
18   BY:  SCOTT A. BURSOR
          PHILIP L. FRAIETTA
19

20   JONATHAN R. DONNELLAN
     KRISTINA E. FINDIKYAN
21   STEPHEN H. YUHAN
          Attorneys for Defendant
22

23

24

25
```

```
 1            (Case called)

 2            THE COURT:  Good afternoon.  Everyone may be seated.

 3            It was a little bit more than a year ago that I

 4   believe that we had our first conference in this case at which

 5   I admonished the parties to do better as far as what I'll call

 6   professionalism and civility is concerned, and clearly my words

 7   were not heeded given the rather excited tone in all of the

 8   various correspondence to the Court, including all of the

 9   various attachments and the like, and I'm disappointed, to say

10   the least, but at this point I'm just going to proceed because

11   it is, I think, a waste of my time to try and counsel you all

12   to do a better job.  Clearly this is a case that is not

13   functioning properly because there is some dynamic here between

14   counsel that I don't understand but that is causing parties to

15   not work together as officers of the court in order to achieve

16   some modicum of civility as far as working through discovery

17   issues are concerned, and that's of concern to me and great

18   disappointment to me, but I'm not going to belabor the point.

19   I think we're going to have additional disputes between now and

20   the end of discovery because it seems to me you all can't help

21   yourselves, and you think you can just run to the Court anytime

22   you have disputes and inundate the Court with correspondence in

23   extremely complicated and nuanced letters that raise very

24   complicated disputes and either expect me to either drop

25   everything else and resolve them or otherwise require
```

HaqWedwCredacted

1   significant briefing and set other matters aside in order to

2   put your case front and center, and I think that's unfair to

3   other parties in other cases.

4           Having said that, you've presented a number of issues

5   to me today, some of which I may be able to resolve, some of

6   which I may not, some of which may require briefing, some of

7   which may not.  We'll have to see how that all plays out.

8           What I also will say also at the outset is that I have

9   one goal in mind, which is this is phase II discovery in this

10  case.  We're here to determine what is appropriate class

11  discovery in this case between now and January 18.  That is how

12  I see my role here.  I am not here to make adjudications on a

13  lot of legal questions, many of which have been presented in

14  the papers today in the guise of discovery disputes.

15          I know you have motions for reconsideration pending,

16  which may or may not resolve some of these issues, but we

17  cannot use the forum where discovery disputes are being

18  presented to resolve questions about standing in the class

19  motion that is to follow, and the like.  And I don't know how

20  the parties reasonably can expect me to make those decisions.

21  I'm here to decide discoverability, not what is appropriate for

22  the admissibility of information, evidence on class action

23  motions.  That will be made before Judge Torres in due course.

24  She has staged this case a certain way, and she has tasked me

25  with the responsibility to resolve discovery disputes.  I'm

1    here to do that.  I'm here to try and create as much of a level

2    playing field as possible.  Obviously the only thing I care

3    about is fairness, and I also want to make sure that I do my

4    best to abide by the dictates of Rule 1 to ensure that the case

5    gets adjudicated in a just, speedy and inexpensive manner,

6    which, by the way, is also the responsibility of counsel, not

7    just the Court.

8            Having said that, rather than have you all get up and

9    make a lot of arguments, I have a lot of questions that I want

10   to ask, and my time is relatively limited.  I want to at least

11   start off by asking questions, and then to the extent there are

12   things that I haven't covered by my questions that counsel

13   believes are necessary for purposes of presenting their

14   positions, I'll hear from you very briefly in that regard.

15           Mr. Donnellan, let's first deal with your letter

16   motion that was filed earlier this month, and in particular,

17   let's focus on the issues with respect to discovery from

18   company 1 and company 2.

19           First of all, how do you even have standing to argue

20   whether discovery taken from those two companies is something

21   that you can address here today?  You can address Hearst's view

22   about that, but company 1 and company 2 have their own

23   independent obligations under Rule 45, and you don't have any

24   standing, as I understand the law, to object if you think the

25   requests are burdensome to them.  So why don't we start with

HaqWedwCredacted

1    that.

2              MR. DONNELLAN:  Your Honor, we think that we may have

3    standing because the data actually belongs to us.

4              THE COURT:  Is there a privilege implicated?

5              MR. DONNELLAN:  What's that, your Honor?

6              THE COURT:  Is there a privilege implicated?

7              MR. DONNELLAN:  There is not, but I want to be very

8    clear.  When we brought this issue to you, it's in the context

9    of discovery requests to Hearst for phase II discovery.  The

10   purpose of our motion was simply to bring up two commonsense

11   limitations that we think are consistent with Judge Torres'

12   summary judgment decision, which is to say that on a

13   going-forward basis, any discovery of us should not include

14   company 1 and company 2, because the plaintiff in this case

15   doesn't have a claim with respect to those companies.

16             THE COURT:  But the plaintiff representing other

17   people may have a claim, isn't that true?  And if they do,

18   that's a legal question under Rule 23 that Judge Torres will

19   have to decide in motion practice before her, right?  But it

20   does potentially relate to those claims, which means it comes

21   within the ambit of Rule 26, so it's not like I can read her

22   summary judgment decision and say, Oh, you won on company 1 and

23   company 2, so that's out of the case, because that's not what

24   she said.  Isn't that right?

25             MR. DONNELLAN:  Well, your Honor, the way we read the

1    cases, and I want to put it in the context of this case.  The

2    context of this case is unusual, and it's different from the

3    other cases dealing with class standing and issues of whether

4    or not a particular representative plaintiff can represent

5    others who may have different facts.  Usually the issue is

6    deferred until class certification because there has been no

7    merits discovery or class discovery.

8            What we have here is a unique procedural posture,

9    where there was full merits discovery with respect to the

10   plaintiff's claims and adjudication with respect to her claims

11   as to these particular companies.

12           THE COURT:  Which by the way, as an aside, is what you

13   all wanted.

14           MR. DONNELLAN:  Absolutely, your Honor.  We absolutely

15   did.

16           THE COURT:  You have to be careful what you wish for,

17   as they say.

18           MR. DONNELLAN:  The reason for that, your Honor, and I

19   think we appreciated this, we thought that the case would

20   either be disposed of at the end of phase I entirely or

21   certainly that the scope of it would be narrowed.

22           THE COURT:  Right, but it turns out you were wrong.

23           MR. DONNELLAN:  Well, we do believe that the scope has

24   been narrowed, because what Judge Torres did find, in a very

25   detailed, very fact-intensive, 55-page opinion is that the

1   facts with respect to each one of these companies, the nature

2   of the transmissions and the nature of the evidence is very

3   different, and at least with respect to these two companies,

4   this plaintiff was not able to make out a claim.

5           THE COURT:  But can you answer the legal question for

6   me, which is in that in a potential class action, in a putative

7   class action, does the individual plaintiff bringing the class

8   action have the right to seek discovery that could enable

9   others similarly situated to that plaintiff to develop their

10  own claims under Rule 23, which is, as I understand it, at

11  least in part what the plaintiff is arguing here?  Do you take

12  issue with that statement as a legal matter?

13          MR. DONNELLAN:  I do, your Honor.  I take issue with

14  it with respect to company 1 and company 2, because under the

15  governing case law, which includes the case that was cited by

16  both parties, the *NECA* case, but also the cases that

17  distinguish that, *DeMuro* and *Retirement Board of Policemen's*

18  *Annuity and Benefit Fund*, two Second Circuit cases, and a host

19  of Southern District cases which have followed that, if the

20  evidence is going to be sufficiently different so that the

21  evidence as to plaintiff cannot stand in for others in the

22  class, then she doesn't have class standing.

23          THE COURT:  Right, but how do we know whether the

24  evidence is sufficiently different until we know what the

25  evidence is?

HaqWedwCredacted

1    MR. DONNELLAN:  Well, what we do know is that the

2    evidence as to her doesn't state a claim, so if that's the

3    evidence that is to stand in for all others, it doesn't state a

4    claim, your Honor.  We have gotten to the merits.

5         THE COURT:  But what if someone -- not Ms. Edwards,

6    someone else -- had factually similar but distinct experiences

7    with company 1 and company 2 such that it would come within the

8    ambit of the statute?  Is that not a scenario that could occur?

9         MR. DONNELLAN:  I think that would be on very

10   different facts, your Honor.

11        THE COURT:  How do I know that?  We don't know what

12   the other facts are, do we?

13        MR. DONNELLAN:  We know it because Judge Torres has

14   said that this plaintiff has no claim with respect to these

15   companies.  And so to the extent to which these other potential

16   plaintiffs might have claims, they need to bring an action and

17   assert those claims, but as to this plaintiff, they don't

18   exist.

19        THE COURT:  Can I ask, as a practical matter, why does

20   this matter so much?  You're going to have other discovery

21   obligations in phase II anyway, right?

22        MR. DONNELLAN:  We certainly will.

23        THE COURT:  So why does it matter that much?  Is it a

24   burden to Hearst to produce this information as it relates to

25   company 1 and company 2?

HaqWedwCredacted

1      MR. DONNELLAN:  Your Honor, it is a burden.

2      THE COURT:  Why is it a burden?

3      MR. DONNELLAN:  Well, we're talking about a scope of

4  discovery, which we haven't even really gotten to exactly what

5  the scope is going to be, but any time you're talking about a

6  subscriber base that is large, and as you, your Honor, noted, I

7  anticipate that there are going to be future disputes about

8  what is required and what plaintiff wants with regard to these

9  subscribers on a going-forward basis.  If we multiply that by

10  different, other entities, where this plaintiff had no claim,

11  it's been adjudicated, then her claim is dismissed.  Summary

12  judgment has been granted for Hearst.  That is necessarily

13  going to impose a burden on us.

14      THE COURT:  It may impose a burden, but let's just

15  stick to the facts as they exist right now.  Mr. Bursor wrote a

16  quite technical letter in response to you in some respects, and

17  I certainly can't begin to say I have mastered all of the

18  technology that's implicated here, but why is it so difficult

19  for Hearst to produce to the plaintiff its side of the

20  transmissions regarding Michigan residents from 2009 to 2016

21  along the lines as described by Mr. Bursor in his letter?  I'm

22  not going to do it justice to try and recapitulate it.

23      Can that not be done?  It's just a question of you

24  think it's not in the case but it's not that hard to do that if

25  you tell me it's in the case?

HaqWedwCredacted

| | |
|---|---|
| 1 | MR. DONNELLAN:  Your Honor, I don't think it's in the |
| 2 | case. |
| 3 | THE COURT:  I know you don't.  And by the way, you |
| 4 | show me in Judge Torres' 55-page opinion, which I've read |
| 5 | twice, where she says, And therefore, there is no need for any |
| 6 | further discovery with respect to company 1 and company 2.  She |
| 7 | could have said that, and she didn't say that.  And indeed |
| 8 | that's part of how I understand the motion for reconsideration, |
| 9 | at least with respect to company 1, because she invited that, |
| 10 | so I don't think it's quite as tidy as you're suggesting. |
| 11 | MR. DONNELLAN:  One thing, and I don't mean to read |
| 12 | too much into this, but when we were asking for a discovery |
| 13 | schedule in phase II, the plaintiffs had proposed a discovery |
| 14 | whereby we would update our responses as to phase I discovery |
| 15 | requests, and they were particularly interested in company 1 |
| 16 | and company 2 going back in time further.  And that was not |
| 17 | included in the scheduling order that Judge Torres signed. |
| 18 | THE COURT:  The scheduling order she signed is |
| 19 | extremely bare bones. |
| 20 | MR. DONNELLAN:  Understood. |
| 21 | THE COURT:  It just has dates. |
| 22 | Just for the record, I mean, I haven't talked to her |
| 23 | about any of this, but I don't know how I can draw or you can |
| 24 | draw or anybody can draw anything one way or the other from her |
| 25 | order of October 3.  I know the joint letter you all submitted |

HaqWedwCredacted

```
1    that was four pages in length that framed some of the very

2    issues that you're now here to talk to me about were presented

3    to her, but she didn't address them, for whatever reason, and

4    that's her absolute right not to have done so.  She simply set

5    a schedule, and by the way, she set a schedule where phase II

6    discover is supposed to be completed a little bit more than two

7    months from now.  Am I going to be seeing you all on a weekly

8    basis between now and then, because I don't have the time for

9    that?

10            MR. DONNELLAN:  I certainly hope not, your Honor.

11            THE COURT:  At the rate we're going, it sounds like

12   you're going to be fighting like cats and dogs on just every

13   little issue here, and I am interested in ensuring that the

14   record is developed so Judge Torres is not frustrated on the

15   Rule 23 motion as far as the state of the record is concerned,

16   as she clearly expressed in her summary judgment decision, and

17   that makes me want to lean on the side of ensuring the record

18   has more in it rather than less in it.  That's why I'm trying

19   to focus on why you're so upset about further discovery about

20   company 1 and company 2 because your reading of Judge Torres'

21   decision is a certain way.  And by the way, if I rule in your

22   favor, they may well go to Judge Torres and get her to say

23   definitively, "Actually, I didn't mean what Mr. Donnellan is

24   reading my summary judgment decision to mean."

25            You can go through that whole exercise if you want,
```

HaqWedwCredacted

1    but I'm trying to understand why as a practical matter, and I

2    want to be practical here today; I don't wand to stand on legal

3    or factual niceties.  I want to deal in practicalities.

4    There's a certain amount of discovery that has to be produced

5    in this case between now and January in order for a class

6    action motion to be made, and then it will rise or fall on the

7    merits, period, and my job is to ensure appropriate,

8    proportional, relevant discovery is produced.  So I go back to

9    the question.

10          Why is it a big deal for Hearst to produce discovery?

11   And perhaps it needs to be narrowed in some way, which we can

12   talk about, as it relates to the transmissions to company 1 and

13   company 2?  I, with all respect, don't feel like I've gotten a

14   good answer to that yet.

15          MR. DONNELLAN:  Your Honor, it would absolutely, in a

16   very practical sense, would require more searching.  There

17   would be more emails to go through, there would be more lawyer

18   hours, and it would be a burden to find ESI for more parties.

19          THE COURT:  That's a level of generality that doesn't

20   move me.

21          MR. DONNELLAN:  Your Honor, I go back to the initial

22   point, which is that we believe that phasing is unusual in the

23   way that it's been done in this case, to have full merits

24   discovery and adjudication with respect to the plaintiff's

25   claims.  It's different from any of the other cases that have

1   been cited here on class standing and the scope of class

2   discovery.  We're not aware of any case where there has been

3   summary judgment against the plaintiff with respect to specific

4   claims and then there was class discovery that was allowed to

5   go forward.  And the cases that we are looking at, your Honor,

6   do say that the plaintiff can't stand in where the proof is not

7   going to be the same as they have, which relates to their

8   claim, in order for others -- then there should not be a

9   prosecution of those claims on that basis.

10          THE COURT:  That's a Rule 23 argument.  That's not a

11   Rule 26 argument.

12          MR. DONNELLAN:  That's a class standing argument.  I

13   understand that.

14          THE COURT:  That's what I'm saying.  I'm not here to

15   decide that.  That's a very important question in this case, no

16   question.  But you want me to tie the plaintiff's hands behind

17   their back in order for them to try and make the arguments that

18   they want to make, and I'm disinclined to do that.  I just

19   don't understand how I can rule in your favor and expect Judge

20   Torres to feel that the plaintiff will have had a fair fight on

21   the issue especially if other than more searching and more

22   lawyer hours there isn't otherwise a burden to Hearst in the

23   first instance.

24          MR. DONNELLAN:  There are three entities for sure, two

25   of which they prevailed on summary judgment, and one where

HaqWedwCredacted

1    there's a question of fact, where discovery absolutely will go

2    forward.

3            THE COURT:  Your argument makes sense to me with

4    respect to Axciom, your agent, because she ruled as a matter of

5    law in that regard, but I don't think Axciom and company 1 and

6    company 2 are identically situated.  I could be wrong, but

7    that's how I read her decision.

8            MR. DONNELLAN:  She did rule as a matter of law that

9    they don't have a claim against Hearst, that she doesn't have a

10   claim against Hearst, the plaintiff, with respect to company 1

11   and company 2.

12           THE COURT:  Right.

13           MR. DONNELLAN:  And the extracts.

14           THE COURT:  But she doesn't suggest that someone else

15   couldn't, does she?

16           MR. DONNELLAN:  She does not address that, your Honor.

17           THE COURT:  Because of the unique phasing.

18           MR. DONNELLAN:  Because of the unique phasing, and

19   here really the issue is where, as reflected in her opinion,

20   the evidence with respect to each one of these companies is

21   very different, and even as to each individual as to each one

22   of these companies is very different, that the claim with

23   respect to these companies has been decided for purposes of

24   this case.

25           That's how I read her decision.  I understand your

HaqWedwCredacted

1    Honor may take a different view of it, but that's the basis.
2    We thought that this was a commonsense limitation based on her
3    ruling, because otherwise, phase I proceedings would have been
4    effectively meaningless.
5         THE COURT:  No, they wouldn't have been effectively
6    meaningless.  They were done this way because if you had been
7    correct in your prediction, we wouldn't be standing here.  But
8    instead of you winning wholesale, you won partial judgment and
9    you lost, and you didn't think that's what was going to happen,
10   but it made sense on some level to stage this case, because
11   class action, as you argued months ago, would be very
12   burdensome if you otherwise were going to win hook, line and
13   sinker in this case, which is what you hoped would happen, but
14   it didn't.  So that's the way this has played out.
15        MR. DONNELLAN:  And we still believe that class
16   discovery will be burdensome, your Honor.
17        THE COURT:  But you have to particularize for me why
18   that's so, otherwise it's a hard argument for me to accept.
19   And you're just making it for you, and I don't know what's
20   happening with respect to the subpoenas to company 1 and
21   company 2.  Are they making a burdensomeness argument, and is
22   it in fact so burdensome for them to do this?  I don't know.
23   That's not before me.  So they're going to provide it
24   potentially on the flip side anyway.  Is what you'd be
25   providing duplicative?  I don't think so; it's the transmission

HaqWedwCredacted

1    from you to them.  That's a separate piece of the puzzle, and I

2    think, not to get ahead of ourselves, this is what has been

3    complained about, in part, about how Hearst has provided in and

4    of itself very little, and so what was before Judge Torres the

5    last time around came from a nonparty, not from Hearst.  So

6    they want to make every effort in phase II discovery to get

7    from Hearst whatever you have and whatever you can provide.  I

8    understand their desire, especially given the criticism of both

9    sides by Judge Torres in her decision about how the record

10   wasn't as developed as she would like, and given how focused in

11   detail her decision was, it's clear she explored every nook and

12   cranny of that record.  And so she's desirous of having the

13   most information possible, and that makes me very reluctant,

14   without hearing more, to simply go along in this kind of cookie

15   cutter, "Oh, yeah, we got summary judgment as to company 1 and

16   company 2, so they're out of the case."

17        If there was language in her decision that you can

18   cite me to that really supported that, I would love you to do

19   that, because I don't read her decision that way.  I just think

20   it's just too neat a solution.

21        All right.  Mr. Bursor, on the other hand, let me ask

22   you, what was the purpose of Judge Torres trying to streamline

23   this case in the way she did by taking it company by company

24   and ruling as she did, if not to narrow it in some fashion, and

25   maybe I am reading this completely incorrectly and that, in

HaqWedwCredacted

```
1    fact, by ruling as she did with respect to company 1 and
2    company 2, she in fact did think she was narrowing this case,
3    and Mr. Donnellan may well be right and I may be wrong in the
4    hard time I was just giving him about articulating this?  What
5    do you have to say about that?
6                MR. BURSOR:  Well, your Honor, the rationale that was
7    given for the phase I, phase II was done at the urging of the
8    defendant, and I'll just tell you the rationale that they gave
9    the Court back in 2016.
10               THE COURT:  I was there.
11               MR. BURSOR:  You were there, yes.
12               THE COURT:  But you can tell me.
13               MR. BURSOR:  He said phase I was to determine whether
14   or not the individual plaintiff has a claim.  He did not say
15   the purpose of phase I is to narrow the proposed class
16   definition.  That is not how this was pitched to the court.
17               The whole phase I was about Article III standing and
18   were there transmissions, and Hearst's story at the beginning
19   of the case was the plaintiff lacked standing and there were no
20   transmissions.  Judge Torres ruled the plaintiff has standing
21   and there were lots of transmissions, there were hundreds of
22   them.  So there was no motion brought to narrow the class
23   definition in any way, and the summary judgment order does not
24   do that in any way.  And none of the claims that the plaintiff
25   pleaded in her complaint -- there's two causes of action.
```

```
1              THE COURT:  Unjust enrichment as well as the statutory
2       one.
3              MR. BURSOR:  And the statutory, right.
4              There's no claim for disclosure to company 1 and then
5       another claim for disclosure to company 2 and company 3, and so
6       forth.  There's a claim for disclosure without consent under
7       the statute.
8              THE COURT:  Why do you need discovery from Hearst
9       about these transmissions when you're going to get them from
10      the companies?
11             MR. BURSOR:  We don't know yet if we're going to get
12      them from the companies, your Honor, and we've been told that a
13      lot of these records are mysteriously missing.  We've been told
14      a lot of the records haven't been preserved.  That's No. 1.
15             THE COURT:  Told by the companies.
16             MR. BURSOR:  We've been told some of the companies
17      have them and are ready to produce and some are having trouble
18      finding them, and we're trying to help them find them, but
19      there's a big monkey wrench in that process, which is something
20      I hope we're going to get to later, which is Hearst's
21      obstruction of that whole process.  But we need to make sure
22      that we get those records from both sides of the transaction
23      and that we get them in the appropriate format, because if you
24      look at the phase I summary judgment order, there were
25      arguments about the authenticity of the file, about whether the
```

1    file was hearsay, whether the file was a business record.

2    That's why we want the file from the sender and the receiver so

3    that we can show who sent it, who received it, what was in it

4    and when it was done, because there's a statute of limitations

5    issue in the case as well, which if you read Judge Torres'

6    order, as you have, you see that a lot of the analysis was,

7    Well, these transmissions were made at some time, but the

8    plaintiff did not meet her burden to show exactly when this

9    transmission was made, so I can't conclude that was within the

10   statute of limitations.

11          That's one of the reasons we're trying to be more

12   thorough in phase II and get things like the FTP logs for the

13   transmissions themselves and the metadata that will show when

14   they were sent, so Judge Torres is going to have that clear

15   record.  But there's no claim in this case for disclosure of

16   company 2 as distinct from company 3 as distinct from anyone

17   else.  There's one claim on behalf of one class, all Michigan

18   residents who had their information disclosed without their

19   consent.

20          That's why your Honor's take on this from the first

21   part of the hearing seems entirely correct to me, but the point

22   that your Honor made that is the most compelling is that it's

23   not an issue for your Honor to decide.  It's an issue for Judge

24   Torres to decide.  We're here just on discoverability, and if

25   your Honor rules no discoverability on any company that

1 plaintiff didn't prevail on, that's going to preemptively cut

2 off a big chunk of our class cert motion, which is then going

3 to force us to try to either take that up with Judge Torres, or

4 when we make the motion to say the reason we don't have this

5 information about the other half of our class is because Judge

6 Cott didn't give it to us. And I don't want to have that

7 happen.

8 What I think we're here on today is discoverability.

9 Discoverability is broad, and clearly under the standard in the

10 *NECA* case of the Second Circuit about class standing, the issue

11 is whether the harm that the plaintiff suffered from disclosure

12 to Experian is the same as the harm that some other class

13 member suffered from disclosure to company 1 or company 2 or

14 company 3. And by the way, company 4, 5, 6 and 7, same thing.

15 It doesn't matter who the recipient is. What matters is, Are

16 they in the within the class as we pled it? If Mr. Donnellan

17 had wanted to narrow that discovery, he should have made a

18 motion to strike the class allegation or to narrow the class

19 allegation. He could have made any motion he wanted in phase

20 I, and he did not make that motion. Judge Torres did not make

21 a ruling like that, and it's not for your Honor to take it upon

22 yourself to preemptively cut off a big chunk of our class cert

23 motion.

24 THE COURT: Mr. Bursor, let me keep you up for another

25 minute. Let's talk about the scope of your requests and how

1    they are effectively nationwide.  I'm troubled by that, to say

2    the least, given as you've just articulated, and that's why it

3    seems to me a natural point to pivot.  Given the proposed class

4    as defined, I don't understand why you would be entitled to

5    something, any data, in fact, unrelated to Michigan residents,

6    because that's outside the scope of the proposed class.

7              MR. BURSOR:  We're not asking -- your Honor, what we

8    want is the files that were transmitted.  OK?

9              THE COURT:  Right.

10              MR. BURSOR:  And the reason we want them is because

11   Judge Torres wants to see what's in those files, and she wants

12   to see when they were sent.

13              THE COURT:  I understand.

14              MR. BURSOR:  OK?

15              THE COURT:  You only want the Michigan residents in

16   those files, correct?

17              MR. BURSOR:  We need the whole file.

18              THE COURT:  Why do you need the whole file?

19              MR. BURSOR:  We're going to take that file.  We're

20   going to do two things with it.  One thing we're going to do

21   with it is prove what information was transmitted when.  That's

22   obvious.  Now, we can't do that if we don't have the file

23   intact, with the metadata and the FTP logs and so forth, and if

24   you have some file other than that file, there's going to be an

25   authenticity objection, there's going to be a hearsay

HaqWedwCredacted

 1    objection.  And we won't be able to get it in as a business

 2    record, because it won't be the file that was transmitted in

 3    the ordinary course of business, kept in the ordinary course of

 4    business.  It will be some special, altered, modified file by

 5    lawyers for this case, and that's a problem.

 6            That's one thing we're going to do with it.

 7            THE COURT:  So that means it needs to have subscribers

 8    from Alabama to Wyoming in it.

 9            MR. BURSOR:  No.  We just need the file.  It happens

10    to have those in it.

11            Now, the second thing we're going to do with the file

12    is we're going to compare it to the defendant's subscription

13    records to figure out who's in the class.  Right?  So there's

14    the files they transmitted, nothing's segregated, it's

15    nationwide.  Right?  But it's got the Michigan people and it's

16    got the class.  And by the way, the class members are a subset

17    of the Michigan people.  They're not all the Michigan people.

18            THE COURT:  Within that period of time.

19            MR. BURSOR:  Within a period of time, and there may be

20    other limitations.

21            THE COURT:  Right.

22            MR. BURSOR:  We have many requests -- not many, but we

23    have some requests where they are state-specific to Michigan.

24    For example, we asked the defendant to produce a data table

25    called the MT-underscore-mag-underscore-sum-data-table, and

1    there's a reason.

2              What we're going to do is take the file that was

3    transmitted, that has everyone in it, and then we're going to

4    use the MT—mag—sum—table to find out who were the Michigan

5    subscribers and who were the Michigan subscribers who purchased

6    directly from Hearst and who were the ones that were within the

7    class period, and when we take those two files together, that's

8    going to identify the class members.

9              Now, let me tell you something about these files.

10   There's no burden to just giving us the same file that they

11   already transmitted.  The burden occurs, and we've had third

12   parties tell us this -- I believe ████████ told us this -- it's

13   more of a burden to cull the Michigan people out of the file

14   than to just give us the same file.  And we're talking about

15   the same file they transmitted every Sunday at noon to

16   Experian.  Why can't they just give us that same file?

17             And we need it.  We need it to present the kind of

18   record that Judge Torres is looking for when she decides the

19   Rule 23 motion.

20             And let me just say, Judge, why would we be looking

21   for something other than what we need to prove our case?  There

22   isn't any other statute in any other state where, Hey, if they

23   give us the Colorado people, we're going to bring some other

24   lawsuit in Colorado.  That's not what's going on here.  What

25   we're saying is any file that has the Michigan people in it,

1    which is every file they transmitted, we want those files, and

2    if your Honor would look at -- I know you don't want to get too

3    deep into the extract rules, but Exhibit B to my letter of

4    October 13.

5            THE COURT:  Yes.

6            MR. BURSOR:  It's the extract rules.

7            THE COURT:  Yes.

8            MR. BURSOR:  And they look like Excel sheets like

9    this.

10           THE COURT:  Yes.

11           MR. BURSOR:  And every page has the same Bates number

12   on it, so that's very unhelpful, but if you flip to, for

13   example, the sixth unnumbered page --

14           THE COURT:  OK.

15           MR. BURSOR:  -- it says ███████ extract at the top.

16           THE COURT:  Does it say extract name?

17           MR. BURSOR:  Extract name, and then the name's

18   ███████ extract.

19           THE COURT:  What I'm looking at is Dunn Data extract.

20   Is that the right page?

21           MR. BURSOR:  You may have gone a page too far.

22           THE COURT:  ███████ extract.  OK.  I'm with you now.

23           MR. BURSOR:  OK.  Your Honor, if you look, the third

24   line down, it gives the file name.  It shows the directory

25   where it's stored.  Then it says file name, ███████, demo

HaqWedwCredacted

1   batch.dat.  Do you see that?

2           THE COURT:  Yes.

3           MR. BURSOR:  That's the file we want.  They send a

4   file like that on the first Monday of every month to ████,

5   and Judge Torres ruled that four of those files had our

6   client's name in it and her PRI, and that the transmission of

7   that file through that FTP site on the first Monday of that

8   month violated the Michigan statute four times.  And now I'm

9   saying I want that file, because in addition to my client's

10  name and PRI, there's the name and PRI of hundreds of thousands

11  of other people in that file, and some of those people are

12  class members.  And we have an obligation to represent them to

13  bring that Rule 23 motion, so I want the same file that Judge

14  Torres said violated the law.

15          Now, your Honor, I want to show you, and by the way,

16  it doesn't say anything in here about Michigan.  Right?

17          THE COURT:  Right, because it's a nationwide list.

18          MR. BURSOR:  Because there's no segregation state by

19  state.

20          THE COURT:  I understand.

21          MR. BURSOR:  If you look at Exhibit C to that letter,

22  your Honor, and I'm going to just keep this at a very high

23  level.

24          THE COURT:  OK.

25          MR. BURSOR:  Exhibit C is a collection of four emails

HaqWedwCredacted

1  that were sent to Charlie Swift on the first Monday of each

2  month or shortly after the first Monday of each month,

3  confirming that someone at Axciom named Megan Damron is letting

4  the fellow at ███████ know:  We uploaded the file.  The first

5  Monday of the month came.  We put the file there for you, so go

6  get it.  Here's the information.

7         And this was copied to Charlie Swift at Hearst.

8  Hearst did not produce this document to us.  You know why?

9  Because the plaintiff's name isn't in the text of the email.

10 Now, the plaintiff's name was in that file and this confirmed

11 the transmission, and we got this from ███████, but when they

12 searched for it, these lawyers, as officers of the court, they

13 said, Well, if it doesn't say Josephine James Edwards, we're

14 not going to produce it.

15        Thank God ███████ produced it because then we were

16 able to show Judge Torres this is what happened.

17        So now, if you make an order that says only Michigan

18 is relevant, if they do what they did during phase I, they're

19 going to go back and look at this email, and they even said

20 this, after we pointed this out.  They're going to go back and

21 look at this email and say, It doesn't say anything about

22 Michigan; it's not responsive; don't produce it.

23        That's what happened in phase I, and what they're

24 trying to do is play a bunch of word games to do that again in

25 phase II to keep us from getting the evidence that we need to

```
 1    make our Rule 23 motion and to prove the class' claim.  Their
 2    entire defense to the phase I summary judgment motion was
 3    plaintiff has not met its burden.  Plaintiff showed
 4    transmissions happened sometime, because the evidence got to
 5    ██████████ and got to Dunn Data, or company 1, company 2.  I
 6    don't want to use the wrong --
 7              Transmissions got there, but plaintiffs didn't show
 8    when they got there and so they should lose summary judgment
 9    because they didn't meet their burden, and the documents that
10    they want to show you to prove that the transmission was made,
11    that's not an authentic business record because they didn't go
12    depose someone across the country to lay the foundation for the
13    business record exception.
14              That's what we're dealing with during phase I.  So
15    now, for phase II, we know exactly what documents we want and
16    exactly what ESI we want.
17              THE COURT:  If you know, why are all your document
18    requests so improper?  Because they're so broadly written,
19    they're all documents about X and all documents about this and
20    any and all documents about Y.  I'm not going to get into a
21    discovery 101 class, but basically every request you make and
22    every objection Hearst has interposed all violate the rules.
23    They do.  They're all improper.  So when you tell me you've
24    drilled down and you know exactly what you want, if you know
25    exactly what you want, then you should have very specifically
```

HaqWedwCredacted

| | |
|---|---|
| 1 | drafted document requests instead of ones that are so |
| 2 | inherently overbroad that one can understand why they would be |
| 3 | responded to with the objections that you received. |
| 4 | MR. BURSOR: Your Honor, the key document request is |
| 5 | on page 3 of my letter, and it's focused on the transmissions |
| 6 | that were made. We want all documents and ESI concerning any |
| 7 | transmission of Hearst subscriber data during the time period |
| 8 | that Judge Torres said is relevant. And to be extra helpful, |
| 9 | we gave examples, we want the extract rules. |
| 10 | Now, they know what extract rules are; I just showed |
| 11 | your Honor the extract rules. We want the correspondence |
| 12 | concerning those transmissions, like the email I just showed |
| 13 | you which should have been produced in phase I but wasn't. We |
| 14 | want the FTP logs. I've never seen a document request that was |
| 15 | this specific and this laser-focused as this document and ESI |
| 16 | request. And they know exactly where this stuff is. If your |
| 17 | Honor looks at those extract rules, it gives the file name. It |
| 18 | gives the directory where the file's stored. It gives the FTP |
| 19 | server through which they sent it. It gives the staging server |
| 20 | where it was stored before they sent it. It tells you when it |
| 21 | was sent, the first Monday of each month or every Sunday at |
| 22 | noon. If you look at that document request on page 3 of my |
| 23 | letter, you know exactly what we're asking for, exactly where |
| 24 | to find it, and it is not burdensome. |
| 25 | For example, for company 1, it's the first Monday of |

HaqWedwCredacted

1    the month.  They know there's 12 files each year.  They know

2    the file names.  They know the server where they were stored.

3    What's so broad about that?  What's so burdensome about that?

4    And your Honor, these third parties, we've been meeting and

5    conferring with them for three weeks because we cannot

6    understand what's taking so long for them to give us exactly

7    what we told them to give us, and they've tell us they have it

8    in some cases and they're ready to produce it.  They don't know

9    if they have to cull the Michigan records.  They tell us that

10   would be difficult; they'd rather just give us the file that

11   they already sent on the first Monday of the month, but the

12   reason they're not giving it to us is because they're having

13   some communications with Hearst's counsel that are dissuading

14   them from doing that.

15          THE COURT:  Is that illegal?

16          MR. BURSOR:  Well, I don't know what's going on in

17   those phone calls.

18          THE COURT:  Do you have case law you can cite to me

19   that Hearst can't talk to these third parties.

20          MR. BURSOR:  I didn't cite any case law like that in

21   my letter.

22          THE COURT:  I didn't see any.

23          MR. BURSOR:  Yes.

24          THE COURT:  I don't think it is.

25          MR. BURSOR:  Is it illegal?

HaqWedwCredacted

```
1          THE COURT:  Is it inherently improper for Hearst to
2     talk to the third parties about their own information that the
3     third parties have?  I don't understand why you're so
4     accusatory, other than I'll incorporate by reference the first
5     three minutes of my remarks today.
6          MR. BURSOR:  OK, your Honor.  Is it illegal for them
7     to talk to the third parties?  The answer is it depends what
8     they said to the third parties.
9          THE COURT:  Of course it does.
10         MR. BURSOR:  OK?  And when we asked them, What did you
11    say --
12         THE COURT:  If they said please destroy documents,
13    yes, that would be improper.
14         MR. BURSOR:  And so we tried to meet and confer in
15    good faith, and we said, Well, what were you talking to them
16    about, "that's none of your business" was the response we got.
17         THE COURT:  And do they have a legal obligation to
18    tell you what they talked to Hearst about?  I don't think so.
19    You can subpoena people from these companies and take their
20    depositions if you want under oath, right?  But they don't have
21    an obligation to tell you on a telephone call to tell you
22    anything, I don't think, do they?
23         MR. BURSOR:  Do they have an obligation on a telephone
24    call?
25         THE COURT:  Yes.
```

1      MR. BURSOR:  They have an obligation to meet and

2 confer in good faith, and to say, It's none of your business

3 what I talked about with the third party who's refusing to give

4 you the documents that we told you they have, I'm not sure how

5 good faith that meet-and-confer is.

6      THE COURT:  Let me talk to Mr. Donnellan about what

7 we'll call the second issue in the letter, the nationwide

8 production issue.

9      What are your thoughts, Mr. Donnellan?

10      MR. DONNELLAN:  Your Honor, we don't think that it's

11 relevant.  It multiplies the amount of information.

12      THE COURT:  When you say you don't think it is

13 relevant, what is "it"?

14      MR. DONNELLAN:  The information relating to

15 non-Michigan subscribers.

16      THE COURT:  Are you going to cull Michigan information

17 out of the documents?

18      MR. DONNELLAN:  We will.  Yes, we will.

19      THE COURT:  You will?  Why would you want to do that,

20 and wouldn't be that far more burdensome if there are otherwise

21 lists of subscribers from states all over the country because

22 they weren't otherwise maintained by state?  I gather they

23 weren't maintained by state, right?

24      MR. DONNELLAN:  I don't believe so, your Honor.

25      THE COURT:  So I'm not understanding why that's your

HaqWedwCredacted

1  desire.  It sounds like it's a lot more work.

2          MR. DONNELLAN:  Well, in a case that's about private

3  information and alleges that this is all private information,

4  these are our subscribers.

5          THE COURT:  There's a protective order in this case.

6          MR. DONNELLAN:  I understand, but it's not relevant.

7          THE COURT:  And they need the list for purposes of

8  timing, not for purposes of names from subscribers in Alabama.

9          MR. DONNELLAN:  We have been very clear from the very

10  beginning, and Mr. Bursor, I think, misrepresented our

11  responses to the document requests and our conversations, that

12  we will produce all materials that relate to Michigan

13  subscribers.  If it relates to Michigan and others, we'll

14  produce that.  If it relates to Michigan specifically, we will.

15  But when it comes to information that is just about a

16  non-Michigan subscriber, we don't believe --

17          THE COURT:  What information is in that category?

18          MR. DONNELLAN:  Those could be subscribers records,

19  lists of names and addresses and other information about those

20  subscribers.

21          THE COURT:  But if you don't segregate by state, how

22  could there be documents that didn't involve Michigan

23  subscribers?  I don't follow.

24          MR. DONNELLAN:  If there's a document that lists

25  Michigan subscribers, we can extract those names or we could

HaqWedwCredacted

1    take that document and we could redact the non-Michigan names.

2              THE COURT:  Why would you want to go to that trouble?

3              MR. DONNELLAN:  Because we want to preserve the

4    confidentiality with respect to our subscribers who are not

5    implicated in this case and not potentially class members.

6              THE COURT:  OK, but that only really would matter if

7    those documents are exhibits in motion papers that are filed

8    with the court or exhibits at trial or something, and then you

9    can talk about redacting names if they otherwise would be on

10   the public record.  But for purposes of discovery pursuant to a

11   protective order, I don't understand why you'd have to do that.

12             MR. DONNELLAN:  Your Honor, I don't understand why we

13   have to justify it when there's no rationale that has been

14   articulated for why they need that information with relation to

15   non-Michigan subscribers.

16             THE COURT:  I'm sure Mr. Bursor would say, If you

17   could give me just Michigan, in these categories that he has

18   particularized, he would be happy to accept that.  But they're

19   not maintained that way.

20             MR. DONNELLAN:  Well, to the extent to which they're

21   commingled with others, we will provide the Michigan

22   information from those records either through an extract or

23   through a redacted document.

24             THE COURT:  But then what about the issue he raised

25   about the document then no longer being in its native format,

1    and then you're going to have something that isn't something

2    that may be in admissible form, because it wouldn't be your

3    business record; it would be something that you have modified?

4    What about that concern?

5          MR. DONNELLAN:  I can't imagine that we couldn't reach

6    agreement.

7          THE COURT:  You can't reach agreement about anything.

8    What are we talking about?  In another case, maybe.  Maybe when

9    this case is over, you'll all tell me why this has become such

10   an acrimonious dispute when it's the kind of case that hardly

11   deserves that.  Hardly.  And I may have said this to you

12   before, but it is shocking to me as a judge, who presides over

13   criminal matters, how members of the criminal bar get along far

14   better with each other given the stakes in those cases, and

15   very accomplished, high-powered lawyers like all of you can't

16   seem to manage to do so in a case like this, which is only

17   about money, after all, at the end of the day.  Let's be

18   crystal clear about that.  And sure, people's privacy is

19   implicated, and that's serious, but it hardly warrants the way

20   you all are litigating this case.

21         MR. DONNELLAN:  Your Honor, with all due respect, I

22   have been accused of spoliating evidence, of obstructing

23   witnesses and the like.  There's been a Rule 11 motion, which

24   was denied, which had been filed against me.  Mr. Bursor's

25   style of inquiry here during meet-and-confers has been, When

HaqWedwCredacted

1  did you stop beating your wife?  The way that he frames

2  questions, which is, When did you destroy the information, and

3  as an I inquisition does not lend itself to productive

4  meet-and-confers.

5          I believe that our attempts here to limit the

6  information to Michigan when we're only dealing with a Michigan

7  class is not an unreasonable request.

8          THE COURT:  But can we go back?  Let's look at his

9  letter on page 3 and that particular request.  OK?

10          MR. DONNELLAN:  Sure.

11          THE COURT:  If he wants the extract rules concerning

12  certain transmissions, you're going to say you're going to give

13  him those but only as it relates to Michigan residents?  Is

14  that what you're saying?  Or B, all correspondence concerning

15  such transmissions, you're going to give him that, but only as

16  it relates to Michigan?

17          I don't even understand what that might mean.

18          MR. DONNELLAN:  Your Honor, no.  We've been very clear

19  with Mr. Bursor,and I'm sorry I wasn't clear enough earlier.

20  What I think I was trying to say here is that we absolutely

21  will provide all extract rules which would relate to the

22  transmission of any Michigan subscriber information.  The same

23  goes with FTP logs.

24          What we're talking about more specifically are data

25  files which reveal individual subscriber names and other

1    personal information of theirs.  That's the information that we

2    would prefer not to produce and has no relevance to the case

3    whatsoever.  And to be clear on this request for production No.

4    32, this is for ESI, your Honor.  This is a brand-new request

5    that was just served.

6            You'll recall from phase I that we had a conference a

7    year ago and you had made the determination that we did not

8    have to search ESI at that point, aside from the 17 document

9    custodians that we had in our consumer marketing group where we

10   searched their emails, for anything that would have any mention

11   of the plaintiff in this case, and also, production from

12   Axciom, our database host, records of transmission and the

13   like.  We produced all that and were entirely fulsome.

14           So with respect to this information and making

15   available ESI under an ESI protocol, that is just beginning

16   now.  We are just arriving at this point in the case.

17           THE COURT:  So it's premature for me to be considering

18   this?

19           MR. DONNELLAN:  I absolutely think it is premature.

20           THE COURT:  You should make a production and then you

21   should have a further meet-and-confer if you're dissatisfied

22   and then you can come back to me.

23           MR. DONNELLAN:  The only issue that we had brought up,

24   or the two issues, one was with respect to scope on company 1

25   and company 2.  The second one was with respect to non-Michigan

1   subscribers, and these are broader scope issues that are not

2   related to these specific categories of information.  We

3   haven't said that we're not going to search for or produce any

4   of those categories.

5           THE COURT:  Hold on a second.

6           Mr. Bursor, you don't care or have a need for

7   information about non-Michigan subscribers, correct?

8           MR. BURSOR:  That's correct, your Honor.

9           THE COURT:  OK.

10          MR. BURSOR:  But if you look at, like, the file that I

11  need, which is referenced on page 3, right in that request,

12  ████████████████████████ --

13          THE COURT:  Right.

14          MR. BURSOR:  It has Michigan people in it, it has

15  Alabama people in it.  It has everybody.

16          THE COURT:  What if he redacts it because he wants to

17  and you just get the Michigan people in that file?  What

18  difference does that make to you?

19          MR. BURSOR:  I need the metadata from that file.

20          THE COURT:  He's not saying he's not giving you the

21  metadata.

22          MR. BURSOR:  I need the file with that name on it so

23  when I look at the FTP logs about when that file was sent, and

24  if they want to do that for their stuff -- first of all, they

25  don't have any stuff, because they spoliated it all, which

HaqWedwCredacted

```
1      we're going to get to.

2                THE COURT:  Mr. Bursor, it's the second time you've

3      done that.  It's annoying.

4                MR. BURSOR:  OK.

5                THE COURT:  Stop it.

6                MR. BURSOR:  They have told us they do not have this

7      file, so there is no burden on them.  They do not have a file

8      to redact.  So why Mr. Donnellan is volunteering to redact a

9      file he does not have I do not understand.  The person who has

10     this file is ███████, and what they tell us is:  It's going to

11     be a pain for us to cull the Michigan people.  Can we just give

12     you that file?

13               Yes, please.

14               Oh, but we're not doing it because we had a phone call

15     with Mr. Yuhan.

16               THE COURT:  You're repeating yourself now.

17               Mr. Donnellan, what about the third parties?  What are

18     we doing about your proposed redaction of non-Michigan

19     residents?  If it's burdensome to third parties, you can't make

20     them do that, right?  I don't really know how to deal with this

21     issue to the extent Mr. Bursor's telling me you're talking

22     about documents you don't have.  Obviously I assume you're

23     talking to me about documents Hearst plans to produce.

24     Correct?

25               MR. DONNELLAN:  That's correct, your Honor.
```

1    THE COURT:  OK, but if you're planning to produce some

2  documents and you're redacting them and the counterparts, if

3  that's the right word, that the third parties have are ones

4  that they would find burdensome to redact, then why isn't it an

5  academic exercise for you to do that?  I don't understand that.

6    MR. DONNELLAN:  Your Honor, I think that the third

7  parties would take the lead from this Court.  I don't think

8  that they want to produce anything that they don't have to

9  produce either.

10    THE COURT:  Well, they're not here, and they have a

11  right to make a burdensomeness argument.  You don't have the

12  right to make it for them.

13    MR. DONNELLAN:  I understand that, your Honor.

14    We're just trying to get some clarity in terms of our

15  own obligations, but we think that it will have an impact in

16  terms of the scope of the subpoena.  Certainly the subpoena to

17  Axciom, which Mr. Bursor has acknowledged and the Court has

18  ruled they're our agent, he served them with a subpoena

19  nonetheless because he says he wants to take a

20  belt-and-suspenders approach.  I would certainly think that any

21  ruling here with respect to our obligation would extend over to

22  Axciom as well, given the fact that they are our agent and it

23  is our data.

24    THE COURT:  If I make a ruling that suggests that you

25  can, at least in the first instance, redact non-Michigan

HaqWedwCredacted

1   residents' information in your production, I would do that

2   without any sense of that ruling binding the nonparties,

3   because that might be burdensome to the nonparties, and they're

4   not before me today.  It would by definition have to be

5   limited, so I don't know how much guidance it really provides.

6   The nonparties are going to say, Oh, because Judge Cott in the

7   Southern District allowed the party to redact in the first

8   instance because they want to and until the judge is told that

9   somehow that creates some of the problems that Mr. Bursor

10  anticipates they might, he's going to allow it to proceed in

11  that fashion doesn't necessarily mean that the third parties

12  would or should go along with that, I wouldn't think.

13          But they're not here.  And I know you've had

14  conversations with them, and that's fine to have conversations

15  with them.  But they might well say to you, We don't want to

16  redact, that's too much work for us.  Right?  So by definition,

17  all that's before me today is not what the third parties are

18  going to be producing, because that would be litigated wherever

19  those subpoenas were served in the first instance, and not

20  here, unless they get transferred here and unless they have

21  objections that they're interposing and are opposed and then we

22  have a proceeding with some of those nonparties, which is the

23  last thing I want, but I'm confident between now and the

24  holidays in December, I suspect it may well be more likely than

25  that that some variation of that is going to occur.

HaqWedwCredacted

1        I just don't quite understand.  I mean, I understand

2   from a macro level why matters that you deem irrelevant, to

3   wit, the names of non-Michigan resident subscribers, shouldn't

4   have any involvement in production in this case.  I get that at

5   a macro level, but it seems a little bit like a red herring in

6   the grand scheme of things.

7        MR. DONNELLAN:  Also, your Honor, with respect to

8   searches for email or other ESI, we'd want that limited

9   necessarily to transmissions of Michigan subscribers as well.

10       THE COURT:  OK, but except the problem with that is,

11  as Mr. Bursor pointed out, in a lot of the search fields

12  there's going to be no reference to the word "Michigan" or any

13  other state for that matter, and that's why he argues that some

14  things weren't produced by Hearst in phase I but they ended up

15  getting from nonparties because they undertook their searches

16  in a way different than you did.

17       And I'm not imposing a value judgment as if you did

18  something right or wrong.  I know Mr. Bursor thinks it was

19  wrong; I'm not in a position to evaluate that today.  But if

20  you take a very narrow view of what your obligation is in terms

21  of how you're going to search for certain things, it may well

22  be that nothing you have will then be produced whereas there

23  are, in fact, lots of documents that should be produced by

24  Hearst.  That's my concern.

25       MR. DONNELLAN:  I understand your concern, your Honor,

HaqWedwCredacted

1    and again, I would just like to say again that we will produce

2    any documents or information that relate to the transmission of

3    Michigan subscribers, even if that includes others and even if

4    it is done on a commingled basis.  But what I would like to

5    exclude are documents and information, because they ask for any

6    ESI or transmissions concerning any transmission of Hearst

7    subscriber data, without limitation.  I want to exclude any

8    documents or information that relate to non-Michigan

9    subscribers, to the extent that those documents exist.

10             THE COURT:  When is your production due?

11             MR. DONNELLAN:  November 17.

12             THE COURT:  Great.  We'll be celebrating Thanksgiving

13   together.

14             Does anybody else have anything else they want to

15   say -- and if they do, it should be brief -- on the two issues

16   presented in Mr. Donnellan's letter?

17             MR. BURSOR:  Yes, your Honor, on the

18   Michigan/non-Michigan people.

19             THE COURT:  Yes.

20             MR. BURSOR:  Just to be crystal clear, I do not care

21   about the non-Michigan people, but what I do care about is the

22   integrity of those files and the metadata in those files, such

23   that if they are redacted, the redaction has to be done in a

24   way that does not affect the metadata for those files, and I

25   don't think that's possible, No. 1.  And No. 2, I can foresee

1    now having to depose the person who did the redaction to figure

2    out how they did that and what effect that may or may not have

3    had on the metadata to the file, and that's going to be a

4    burden on us, and I don't want to do that.  I just want the

5    files so I can identify the class members and identify the

6    dates and times of the transmissions.

7         THE COURT:  Without knowing what the production is, I

8    don't know how we can resolve the issue.  If I rule the way

9    Mr. Donnellan wants on this particular point, it would clearly

10   be without prejudice to your making an application if it isn't

11   produced in a way where the metadata or any other aspect of it

12   somehow is not as useable as it otherwise would have been.

13        Mr. Donnellan, I understand and hope you're mindful of

14   the point Mr. Bursor is making in this regard.  Do you

15   understand the point he's making?

16        MR. DONNELLAN:  I do, absolutely.

17        THE COURT:  Do you believe the production that you are

18   anticipating making wouldn't corrupt in some fashion the

19   metadata of the production?

20        MR. DONNELLAN:  I wouldn't make it if it would corrupt

21   it.

22        THE COURT:  OK.  I'd like to take a short recess, and

23   then I'll come back and we'll figure out how we're going to

24   proceed.

25        (Recess)

HaqWedwCredacted

1          THE COURT:  You may be seated.

2          There are two issues in Hearst's letter to the Court

3   of October 11.  And actually, before I get into this, can I ask

4   the parties a simple question, which is the Boelter case is

5   dismissed and yet the parties keep filing everything in both

6   cases.  Why are we doing that?  Is there a reason I don't know?

7          MR. BURSOR:  Your Honor, Judge Torres ordered us to do

8   that.

9          THE COURT:  Do you know why?

10         MR. BURSOR:  I didn't ask her, but I just did what she

11  said.

12         THE COURT:  That would be good.

13         Because it seems somehow more burdensome to me,

14  because when you file two things, then any time even a

15  ministerial matter like adjourning the conference from

16  yesterday to today, as we did, I noted, last night or whenever,

17  Oh, I didn't do that on the second docket, I only did it on the

18  first docket sort of thing.

19         Is there a particular reason from the lawyers'

20  standpoint why we need to be doing that, or should we simply be

21  filing everything at this point just in Edwards and not in

22  Boelter?

23         MR. BURSOR:  That would be fine with us, your Honor.

24         THE COURT:  OK.

25         MR. BURSOR:  I think at the time Judge Torres ordered

HaqWedwCredacted

1   us to do that, the two filings, that was before the Boelter

2   case --

3           I'm sorry.  We did what she said, but we're fine to do

4   it your way.

5           THE COURT:  Do you have a view, Mr. Donnellan?  Does

6   it matter?  I think it has to do with the consolidation.

7           MR. DONNELLAN:  It does have to do with the

8   consolidation.  As I recall, there is no consolidated complaint

9   actually filed on the Edwards docket.

10          THE COURT:  I see.

11          MR. DONNELLAN:  It's on the Boelter docket only.

12          THE COURT:  What if that were changed?

13          MR. DONNELLAN:  That would be fine with us, your

14   Honor.

15          THE COURT:  All right.  Why don't I take it upon

16   myself at some point to talk to Judge Torres about that.  I

17   just think it may be less work for everybody and less for the

18   Court to keep track of as well.  I'll separately discuss that

19   administrative piece with her.

20          Back to our issues here.  In the October 11 letter,

21   the first issue is what we've discussed about the discovery

22   with respect to company 1 and company 2.  Hearst has argued

23   that it's improper, and I'm not going to recap all of what was

24   said both in the letter and at our hearing here today, but my

25   conclusion is for some of the reasons that I articulated during

1   the course of our colloquy, I think the appropriate

2   direction -- or guidance, I think, was what was sought from

3   me -- is that I am not prepared to rule that discovery with

4   respect to company 1 and company 2 is improper on the record

5   that exists today.  I think that there is the possibility that

6   others -- not Ms. Edwards, but others -- may have viable claims

7   with respect to company 1 and company 2, and plaintiff should

8   be given the opportunity in discovery to develop the record on

9   that point.

10              As I said earlier, this is not on some level a

11  question of discoverability; it's a question of law that has to

12  be adjudicated in the context of the Rule 23 motion; to wit,

13  whether the plaintiff can pursue and develop this evidence on

14  behalf of others who may have claims that she does not.  That

15  question is not before me, and I think if I were to foreclose

16  any discovery, as Hearst has asked the Court to do, that the

17  record would be less developed than it otherwise could be and

18  should be, and in light especially of the criticism Judge

19  Torres lodged in her summary judgment decision in which she

20  felt that the record in some respects hadn't been fully

21  developed, that to me is yet another reason why I should err on

22  the side of allowing discovery at least as a broad category to

23  go forward.  That's not a license for there to be any kind of

24  discovery with respect to company 1 and company 2.

25              Obviously if Hearst wants greater clarity on the point

HaqWedwCredacted

1     and wants a legal ruling, if you will, on the point, in advance

2     of the Rule 23 motion practice, you can seek further review of

3     this issue before Judge Torres.  That's your right.  But at

4     least I am tasked with discovery-related decision-making only,

5     and in that context, I'm not prepared to foreclose discovery

6     with respect to company 1 and company 2.

7          So that's as to that issue.

8          On the second issue, I think in light of the colloquy

9     we've had that it is premature on some level for me to rule on

10    the question about whether there can or cannot be discovery

11    with respect to nationwide magazine subscribers.  I take

12    Mr. Donnellan at his word that it is Hearst's preference in the

13    first instance when it responds to the request for production

14    in mid-November that it would like to take the opportunity, as

15    it deems appropriate, to redact non-Michigan residents.  I am

16    certainly of the view, given how the class has been proposed,

17    that clearly non-Michigan residents' information on some level

18    is not relevant to this case.  However, Mr. Bursor has made

19    several, I think, salient points about ensuring that what is

20    produced does not disturb, corrupt or otherwise alter the

21    production in a way that will hamstring the plaintiff from

22    making arguments it needs to make both with respect to timing

23    and the integrity, if you will, of the documents at issue.

24         I would say I'm not going to prevent Hearst from

25    undertaking the proposed redactions that have been articulated,

HaqWedwCredacted

1    but I would say, without sounding too harsh, that you do so at

2    your peril, because it could lead to other issues. And in

3    making this ruling it is plainly without prejudice to the

4    plaintiff seeking further relief from the Court if it believes

5    that the production that is made in mid-November is one that

6    they believe threatens the integrity of their further use of

7    the documents, either on motion or at trial, for purposes of

8    its admissibility.

9           That's where I come out on that issue.

10          I think we've resolved, I'll say the first patch of

11   information. It's now after five. I had a 5:00 conference

12   scheduled, which I moved to 5:30, anticipating that this was

13   going to be a longer hearing than I had originally anticipated.

14          I think what I'd like to do is spend a little time at

15   least on Mr. Bursor's October 19 letter and let the parties

16   speak to those issues, and then I'll determine to what extent I

17   think I can make some rulings today and whether we should, in

18   fact, set some kind of a schedule for formal briefing on the

19   spoliation issue.

20          I will say at the outset, given what I've already said

21   in my exchanges with Mr. Bursor, that I'm not in a position

22   today based on the record in front of me, to use Mr. Bursor's

23   word, to "admonish" Hearst's counsel to cease efforts to urge

24   third parties to withhold evidence. Talk about a loaded

25   phrase. I don't have anything in the record in front of me to

HaqWedwCredacted

1    suggest that that's, in fact, what has happened other than

2    Mr. Bursor telling me that's what he thinks is happening.  I

3    know of nothing that prohibits Hearst from talking to third

4    parties about their production as it implicates Hearst's

5    interests here.

6            Obviously if Hearst counsel were to be urging them to

7    withhold or otherwise destroy evidence, that would be an

8    extraordinarily serious issue.  But the record, certainly as it

9    is today, doesn't justify an admonishment or anything else.

10   That ruling is without prejudice to the record being further

11   developed if there is any evidence to support that sort of

12   request.

13           Of the four items in the relief requested, that

14   dispenses with C.

15           Let's go back to A, and let's talk about No. 34, the

16   nature of the request and the nature of the response.

17           Mr. Bursor.

18           MR. BURSOR:  Sure, your Honor.

19           I take the Court's guidance very seriously about

20   trying to meet and confer and civility and so forth, and what

21   we want to do -- we really don't want to sling mud.  What we

22   want to do is find out what happened to the files and if we can

23   recover the files, and if we can't recover the files -- I think

24   we're going to get some of them and not get some others and

25   then we'll explain to the Court what we were able to recover

HaqWedwCredacted

1    and what we were not able to recover, and we're going to ask

2    for, if there's some that we can't get that are important, we

3    may have to ask for an adverse inference.  If there are some

4    additional costs to recovering them, then we may ask for that,

5    but we're not asking for any of that today.

6         THE COURT:  Can I ask, to just skip ahead a little

7    bit, but since you're saying what you are, why doesn't that

8    augur, if I'm using the word correctly, in favor of deferring a

9    potential spoliation motion until you actually see everything

10   you're going to get rather than what I think might be a

11   premature motion on a not fully developed record?

12        MR. BURSOR:  I agree with that.

13        THE COURT:  You do.

14        MR. BURSOR:  I agree with you.

15        THE COURT:  OK.

16        MR. BURSOR:  I don't want to make it.

17        THE COURT:  But your letter said, We'd like you to set

18   a schedule for briefing, and I didn't think you meant in

19   January.  I thought you meant today.

20        MR. BURSOR:  What I think needs to happen is we need

21   to find out were the files deleted or destroyed, whatever term

22   you want -- I don't want to use a loaded term -- what happened

23   to the files?  And then once we find that out, once we know,

24   then we can bring the motion, if a motion is in order.

25        THE COURT:  Right, and that depends not just on

HaqWedwCredacted

1    document production, it also depends on depositions.  Right?

2    Shouldn't it?

3              MR. BURSOR:  I would have hoped that we could have

4    just had a phone call among counsel and ask them what happened

5    to the files and they would tell us.  That's what I would have

6    hoped through a civil meet-and-confer process.  But that didn't

7    happen, so we have no information about what happened to the

8    files.  All we're asking for now, request No. 34, documents

9    about what happened to the files, to paraphrase.  All documents

10   concerning the policies, procedures or practices for retention.

11             THE COURT:  "All documents" is incredibly broad.  What

12   are you really want?  What are you really looking for in No.

13   34?

14             MR. BURSOR:  I want to know if there were

15   communications between Hearst and Axciom about preserving

16   documents for *Grenke* and about destroying documents before,

17   during or after *Grenke*, anything about the preservation or

18   destruction of the files that we just talked about, the FTP

19   logs, the actual database files that were transmitted, those

20   emails to Charlie Swift.  If there were communications about

21   that, we want those communications.  And if those

22   communications came from lawyers, we want a privilege log if

23   there's a claim of privilege.  That's all we want now, is to

24   get the documents about what happened to those files.  Because,

25   your Honor, there is no question that there was a duty to

HaqWedwCredacted

1    preserve them.

2           THE COURT:  Well, there is a question, right?  There's

3    a legal question, which is if one lawsuit ends and another

4    lawsuit isn't brought for four months, or whatever it is,

5    whether as a legal matter there is a duty.  That's a legal

6    question.

7           MR. BURSOR:  That's a legal question your Honor has

8    answered before.

9           THE COURT:  Well, I answered it not in the same

10   context, if you're citing *Pippins*.

11          MR. BURSOR:  *Pippins*, yes.

12          THE COURT:  But *Pippins* is not on all fours with the

13   facts; it's just not.  That was about something in the context

14   of a pending case.

15          MR. BURSOR:  OK.

16          THE COURT:  Not when a case ended and another case

17   started.

18          MR. BURSOR:  Well, the *Napster* case is that, where one

19   case ended and another case started.  But your Honor, if the

20   files were deleting during the pendency of *Grenke*, then we

21   don't even get to that.  We don't even get to the *Pippins*

22   question.

23          THE COURT:  OK, but you don't know the answer, is your

24   point, and you want to know what the answer is.  You think you

25   know what the answer is.

HaqWedwCredacted

1          MR. BURSOR:  Well, what Mr. Donnellan told us --

2          THE COURT:  Doesn't that mean you'd have to depose

3     somebody?  Why couldn't you serve a 30(b)(6) notice on this

4     issue?

5          MR. BURSOR:  We have.

6          THE COURT:  OK.

7          MR. BURSOR:  We've done that.

8          THE COURT:  But you haven't taken a deposition yet.

9          MR. BURSOR:  We don't have any documents yet.  I'm

10    trying.

11         THE COURT:  I know you don't have any documents yet

12    because they're not due until mid-November, right?

13         MR. BURSOR:  But we served a subpoena before.  Judge

14    Torres gave them extra time.  We didn't know when their

15    production was going to be due.

16         But your Honor, I take your point.  That's why we

17    haven't made the motion yet.  I want to make it on a proper

18    record.  If they come back and say, Hey, you know what, we

19    found them, then I won't make a motion.  I don't want to make a

20    motion that's unnecessary.  All I want to do is get the files,

21    and if I can't get the files, I want to know why so I can tell

22    this Court.

23         THE COURT:  OK.  But when you say documents concerning

24    Hearst's policy, procedures or practices for retention or

25    destruction of documents, that's all very broad, isn't it?

HaqWedwCredacted

```
1          MR. BURSOR:  I don't think it's very broad.  How do
2   you specify did Hearst send a communication to Axciom to
3   destroy these files?  Did Hearst send a communication to Axciom
4   about Grenke and making the litigation hold for Grenke.
5          THE COURT:  Shouldn't you ask for litigation holds in
6   Grenke?
7          MR. BURSOR:  Not broad enough, because then if I get
8   the litigation hold but I don't get the email from Hearst that
9   says, Hurry up and destroy those records before we get sued --
10         THE COURT:  Shouldn't you ask for what their policy
11  for destruction of documents is?
12         MR. BURSOR:  We've done that.
13         THE COURT:  That's how you read this?
14         MR. BURSOR:  Yes.
15         THE COURT:  OK.
16         Mr. Donnellan, what are you prepared to provide with
17  respect to No. 34?
18         MR. DONNELLAN:  Your Honor, we already produced last
19  year our document production policy that's been in existence
20  since before the relevant time period and up to the present.
21         THE COURT:  Has it been the same the whole time?
22         MR. DONNELLAN:  There was one or two versions.  One,
23  the same one.
24         THE COURT:  Because I remember reading that.  I think
25  it was from 2004, if I'm remembering correctly.
```

HaqWedwCredacted

1          MR. DONNELLAN:  That's correct.

2          THE COURT:  And the policy that was produced in 2004

3     except for one change has been the same until 2016?

4          MR. DONNELLAN:  That's correct, your Honor.

5          I'm sorry.  No changes.  I misspoke.

6          THE COURT:  And that document has been produced.

7          MR. DONNELLAN:  That document was produced a year ago.

8          THE COURT:  All right.

9          MR. DONNELLAN:  No. 1.

10         No. 2, this whole question about where are the

11    transmissions, this was an issue that was the subject of

12    intensive discovery last year during phase I where Mr. Bursor

13    asked Hearst's 30(b)(6) witness, Do you have records of

14    transmissions?

15         No, we don't.

16         THE COURT:  But why wouldn't Hearst have them?

17         MR. DONNELLAN:  Because it's in the nature of the FTP

18    file process, and I said this to you, your Honor, and I

19    explained it when we were last here in front of you, last

20    October 11, which is that we don't retain copies of it.  The

21    extracts are uploaded, they're downloaded.  Copies of that are

22    not retained.

23         THE COURT:  And that's pursuant to a policy of some

24    kind, or something else?

25         MR. DONNELLAN:  Business practice.

HaqWedwCredacted

1      THE COURT:  OK.  And has a witness so sworn?

2      MR. DONNELLAN:  Yes.

3      THE COURT:  OK.

4      MR. DONNELLAN:  Yes, our 30(b)(6) witness attested to

5  that last year.

6      THE COURT:  OK.

7      MR. DONNELLAN:  And Mr. Bursor took question with it

8  last year and then didn't follow up with spoliation charges or

9  try to burn the house down over that.  This is relatively new.

10     THE COURT:  This being the spoliation issue?

11     MR. DONNELLAN:  Yes, the spoliation charges at this

12 point directed toward us.

13     And all of it hinges on not only what happened before

14 this case was ever brought but what happened after.  He wants

15 to go back and revisit essentially, do a forensic audit of what

16 our responsibilities may have been during the *Grenke* lawsuit

17 and what happened during that lawsuit.

18     Your Honor, that not only would be a wasteful and

19 irrelevant exercise, it's entirely irrelevant because there's

20 no duty to preserve after *Grenke*.

21     THE COURT:  That's the same legal question that I

22 challenged Mr. Bursor on, isn't it?

23     MR. DONNELLAN:  It absolutely is, your Honor.

24     THE COURT:  I mean, I know you think there isn't a

25 duty and he thinks there is a duty.  Funny, you both don't

HaqWedwCredacted

1    agree about that.

2            MR. DONNELLAN:  It is funny that we don't agree.

3            In all of the cases that have been cited, your Honor's

4    case in *Pippins*, they also cite *Fujitsu*, *Casale*, *M&T Mortgage*

5    *Company*, *Napster*, in each one of those cases there was either

6    pending litigation at that time, such as in the *Pippins* case.

7    You had that also in *Casale*, where the court had retained

8    jurisdiction to ensure compliance with orders, the *M&T Mortgage*

9    case, there were overlapping cases in that particular case.

10   The *Napster* case, there was a subpoena and also a direct threat

11   of personal litigation.

12           In all of these cases, you had a situation where the

13   parties were entirely on notice that there was active

14   litigation.

15           Let me tell you about the *Grenke* case.  The Michigan

16   VRPA was enacted back in the late 1980s, and for 25 years,

17   there was no enforcement history whatsoever.  There were no

18   public cases, no private cases, until a Chicago law firm, the

19   Edelson firm, started filing lawsuits against magazine

20   companies claiming that their list rental practices violated

21   the Michigan VRPA.  The *Grenke* case was one of those cases.  It

22   was filed in 2012.  They filed a class certification motion at

23   the outset of it.  That class certification motion was

24   withdrawn in 2013.

25           In 2015, the parties agreed to dismissal with

HaqWedwCredacted

```
1    prejudice.  At that point there were no other pending claims,
2    no other threatened claims, no other people who would have been
3    covered by the class who had then stepped forward to bring
4    their own actions or to join into the case.  There was no
5    reason to anticipate that there would be any further
6    litigation, and at that point, no other law firm, except for
7    the Edelson firm, had come forward and filed any claims.  So we
8    had every reasonable expectation that we were done, and there
9    was no threat of litigation, no pending or overlapping
10   litigation, nothing that would put anyone on notice of another
11   claim.
12           On that basis, I said to Mr. Bursor, What's the basis
13   for your claim of spoliation?  What's the basis for your claim
14   to want to go back and to revisit history?  There was no legal
15   duty going forward, and there's no basis to go back in time to
16   examine what did or didn't occur in the second-guess judgments
17   during the *Grenke* case.
18           THE COURT:  Based on what you said, and you used the
19   phrase "business practice," right, I'm not sure why this
20   matters in some respects, because your business practice wasn't
21   to retain anything anyway, right?
22           MR. DONNELLAN:  That's correct, your Honor.
23           THE COURT:  So irrespective of whether there is or
24   isn't a duty, the record is going to be what the record is,
25   which is you wouldn't have preserved things because your
```

1    business practice wasn't to, right?

2            MR. DONNELLAN:  Our business practice was not to take

3    those records in the direction of that case.  The focus of that

4    case was list rental.  Certainly all documents were preserved

5    which related to list rental practices.  In that case, in Rule

6    26 conferences, it was never raised about other sorts of

7    issues.  There were never any requests to do anything more than

8    what was our normal business practice.  So your Honor, there's

9    just no basis to go back and to revisit any of that.  And when

10   that case ended, our legal obligations ended.

11           THE COURT:  Well, you've produced Hearst's policy that

12   has existed since 2004 about document retention and/or

13   destruction, correct?

14           MR. DONNELLAN:  That's correct, your Honor.

15           THE COURT:  And you have that, Mr. Bursor?

16           MR. BURSOR:  Yes, your Honor.

17           THE COURT:  OK.  Is there something else you think

18   that Hearst should produce that you think exists that they

19   haven't in that regard?

20           MR. BURSOR:  Yes, your Honor.

21           THE COURT:  Which is what?

22           MR. BURSOR:  Any communications about a litigation

23   hold for *Grenke*, because if the normal business practice is to

24   not preserve these records, once you get sued, you change your

25   normal business practice and you preserve them under a

1  litigation hold.

2          THE COURT:  Let's say they say there wasn't a

3  litigation hold, then what?

4          MR. BURSOR:  Then there was spoliation ongoing during

5  the *Grenke* case.

6          THE COURT:  What difference does that make for our

7  case?

8          MR. BURSOR:  Here's the difference it makes.  There's

9  a legal question, Did their duty to preserve continue between

10 *Grenke* and the 87 days when we filed?

11         THE COURT:  Right.

12         MR. BURSOR:  That's the legal question.

13         THE COURT:  Right.

14         MR. BURSOR:  If they were destroying the records

15 throughout *Grenke*, that question becomes irrelevant because

16 spoliation was going on before grange was even dismissed, and

17 what Mr. Donnellan is saying --

18         THE COURT:  How can you seek spoliation sanctions in

19 this lawsuit if there was what you suggest in another unrelated

20 lawsuit?

21         MR. BURSOR:  By saying they had a duty to preserve it

22 and at the time they destroyed it, they violated that duty.

23         THE COURT:  Preserve it for what?

24         MR. BURSOR:  For litigation.

25         Now, you're saying did they have a duty to preserve

HaqWedwCredacted

1    for the *Grenke* litigation or for any litigation by any class

2    member in *Grenke*?  That's a legal question.  Your Honor is

3    going to have to rule on that when we bring the motion, but

4    shouldn't we know what happened?  Should we know what happened

5    or not before we brief the motion?

6            THE COURT:  By the way, since we're getting into this

7    a little bit more deeply than I anticipated, haven't you waived

8    this argument?

9            MR. BURSOR:  Have I waived it?

10            THE COURT:  Yes.  Where have you been on this

11    argument?  I mean, you knew everything you're telling me a year

12    ago.

13            MR. BURSOR:  I have not waived anything, and I did not

14    know that they didn't preserve them during *Grenke*.  I still

15    don't know that, but that's what Mr. Donnellan said in the

16    brief, and I didn't know that until October 5.  That's when I

17    became more active on this issue, but this was always going to

18    be an issue, your Honor.

19            There's no case law that you waive spoliation by not

20    bringing it in phase I of a bifurcated discovery.  I'd like to

21    see the case law on that.

22            THE COURT:  I'm confident in saying having done no

23    research that I'm sure you're right in what you just stated.

24            MR. BURSOR:  Right.

25            THE COURT:  Because this case has an unusual

HaqWedwCredacted

1   procedural posture to say the least.

2              As a practical matter, where do we go from here as far

3   as the particular production in this case is concerned given

4   what Mr. Donnellan tells me has been produced?  What relief are

5   you seeking from me, leaving aside the timing of any potential

6   motion, which I think we've agreed if it's going to be made

7   should be made at the back end of discovery so we know what the

8   full record is that exists.

9              MR. BURSOR:  I do agree we should wait to find out

10  what happened.

11             THE COURT:  OK.

12             MR. BURSOR:  But in the meantime we need to find out.

13             THE COURT:  OK.

14             MR. BURSOR:  Was there a litigation hold in *Grenke*?

15  If there was, why weren't these records preserved?  What

16  happened to them?

17             THE COURT:  Let me ask you this.  Why don't you serve

18  some requests for admissions?  Why isn't that a more direct way

19  of getting at this?

20             MR. BURSOR:  Why can't they just tell us?  Why don't

21  they just say, Here's what we did?  Then we're not back here

22  five times on discovery disputes.  Requests for admissions, I'm

23  going to get four pages of objections and no answer.

24             THE COURT:  That would be in violation of Rule 36.

25             MR. BURSOR:  Of course it would be, but that's what's

HaqWedwCredacted

1    going to happen.

2              THE COURT:  Mr. Donnellan, are you not prepared to

3    answer those questions?

4              MR. DONNELLAN:  I'm not prepared to answer those

5    questions, your Honor, because I don't believe they're

6    relevant.

7              THE COURT:  Then we need to adjudicate the legal

8    question of whether they're relevant or not.

9              MR. DONNELLAN:  Yes, your Honor.

10             THE COURT:  So we should do that and brief that right

11   now.  Then we shouldn't wait.

12             MR. DONNELLAN:  I think your Honor can rule on it

13   based on the authority that's been provided.

14             THE COURT:  I'm not ruling today.  To be clear, I'm

15   not ruling today.

16             MR. DONNELLAN:  That's fine.

17             Your Honor, Mr. Bursor's got the analysis exactly

18   opposite, which is he says, Let's figure out what happened in

19   the *Grenke* case, and that will somehow relate to what their

20   duty was.  The reality is regardless of what happened in the

21   *Grenke* case, if our duty ended at the end of that case, then --

22             THE COURT:  OK, let's do this.  Of course, I'm never

23   looking for more work than I already have, because I have

24   plenty of work, but it seems to me I need to resolve what we're

25   calling this duty question, and I think I should resolve that

1    sooner rather than later because that's going to impact

2    potential discovery production or not.

3         Why don't we do this.  Why don't I give you all an

4    opportunity to develop whatever additional arguments you want

5    to make and file a full-fledged brief on the subject, and I'll

6    give you up to 15 pages.  You may need far less than that.  I'm

7    not encouraging 15 pages, if you want to submit seven, that's

8    great.  But why don't we have simultaneous briefs.  Why don't

9    we have two sets of simultaneous briefs.  I'll let you do that.

10   OK?  That's probably more briefing than I want or need, but

11   that way you can respond to each other as well.  In fact, let's

12   do this.  Ten pages for your main briefs, five pages for your

13   reply briefs.  OK?

14        How much time do you want to submit these briefs?  To

15   some extent you're going to be recasting what you already

16   submitted in your letters, but you can develop that argument a

17   little more.

18        MR. BURSOR:  One week and one week would be fine.

19   This is an important issue we need to resolve quickly.

20        MR. DONNELLAN:  That's fine, your Honor.

21        THE COURT:  OK.  Today's the 26th.  We'll have your

22   main briefs on the 2nd and we'll any replies on the 9th.  And

23   since it's a discrete issue, I'll obviously do my best to try

24   and get a written ruling out.  I don't anticipate I'll need to

25   reconvene you all.  I'll just issue a written decision, I hope

HaqWedwCredacted

```
1    not a terribly long one, and I'll try and front burner that as
2    much as I can so that you have guidance on it.  Until I do
3    that, I'll have to put a pin in the rest of this to some
4    extent, because I think how I rule will affect how at least
5    some further discovery or not proceeds on this discrete point.
6              MR. BURSOR:  Your Honor, not to go back over treaded
7    ground, but the issue goes beyond just whether there was
8    spoliation or not spoliation.
9              THE COURT:  Let me be crystal clear about what you're
10   going to brief.
11             MR. BURSOR:  Yes.
12             THE COURT:  I would not characterize what we're
13   briefing as spoliation motions.
14             MR. BURSOR:  Right.
15             THE COURT:  What we're briefing right now is simply
16   the question of whether Hearst did or did not have a duty here
17   to preserve in light of the sequence and timing of Grenke
18   relative to the sequence and timing of Boelter and Edwards.
19             MR. BURSOR:  I understand that.
20             THE COURT:  That's the issue.
21             MR. BURSOR:  I understand that.
22             THE COURT:  That's a narrow legal question that I'm
23   going to opine.  That's all I'm opining on and nothing beyond
24   that.
25             MR. BURSOR:  I understand that.
```

HaqWedwCredacted

1      THE COURT:  OK.

2      MR. BURSOR:  But let me tell you why I think that may

3 not be necessary.  Whether they had a duty to preserve or not

4 does not change the discoverability of the *Grenke* litigation

5 hold, because the relevant time periods here overlap.  OK?  And

6 that means for purposes of discoverability, we're entitled to

7 anything that's relevant or may lead to the discovery of

8 relevant evidence.

9      THE COURT:  That's not the standard anymore, just so

10 you know.  The rule has changed.

11      MR. BURSOR:  But it's close enough for purposes of

12 this argument, your Honor, because what I'm getting to is if

13 there was a litigation hold or not a litigation hold or if

14 there were communications about preserving or destroying

15 records that are relevant to this litigation, we're entitled to

16 discover them, because that's going to help us find the records

17 that are relevant to this litigation.  And so whether they had

18 a duty to preserve or not does not matter because Rule 26 is

19 broad enough that these documents are relevant whether they had

20 a duty to preserve or not.  The *Grenke* litigation hold or

21 communication about destroying the records is relevant to this

22 case whether they had a duty to preserve or not, and we're

23 entitled to get those documents whether they had a duty to

24 preserve or not.

25      THE COURT:  OK.  Let's do this.  Within your briefing,

HaqWedwCredacted

          1  you can brief both the duty question and the related secondary
          2  question, because I assume, Mr. Donnellan, you disagree with
          3  everything Mr. Bursor just said.  So why don't we fold that in
          4  as well, and I will adjudicate both the duty question and the
          5  irrespective-of-the-duty question, if you will.  OK?
          6          MR. DONNELLAN:  Thank you, your Honor.
          7          MR. BURSOR:  Yes, your Honor.
          8          THE COURT:  Anything else we need to do today?
          9          MR. DONNELLAN:  Two matters, your Honor, quickly.
         10          One is Mr. Bursor was reading earlier from a
         11  confidential document, the Charlie Swift email where he named
         12  company 3, which is under seal, and so for purposes of this
         13  transcript, I would request either that we have the opportunity
         14  to review the transcript to make appropriate redactions or that
         15  the entire transcript be sealed.
         16          THE COURT:  I certainly don't think the entire
         17  transcript should be sealed over the reference to a single
         18  name.
         19          MR. DONNELLAN:  Agreed.
         20          THE COURT:  And I think as I understand the process,
         21  when you order the transcript, it's going to be provided and
         22  the parties are given an opportunity to seek redactions, and if
         23  you want to, then you'll know what page it is and if all we
         24  literally need to do is redact a single name, you can make such
         25  an application to me, and I will issue an order to that effect.

```
1              Let me go off the record for a minute.

2              (Discussion off the record)

3              THE COURT:  I think that's how we'll deal with that.

4      That shouldn't be a problem.

5              MR. DONNELLAN:  Perfect.

6              The second thing is earlier when I said earlier we

7      were going to produce documents on November 17, I just wanted

8      to clarify that a bit.  In our discussions with plaintiff's

9      counsel earlier we agreed, consistent with the Court's order,

10     that we would begin our production on the 17th and it would be

11     a rolling production.  We do anticipate making a substantial

12     production on the 17th that will include information from our

13     databases, but the review of emails may go on beyond that.  But

14     we will obviously be making production as soon as possible.

15             THE COURT:  When you say rolling, did Judge Torres

16     make some ruling in this regard?

17             MR. DONNELLAN:  Judge Torres' scheduling order

18     provides that our deadline to respond to phase II discovery

19     requests is on the 17th.

20             THE COURT:  Right.  That's right, from her order.  OK.

21             MR. BURSOR:  And your Honor, because of that, there

22     have been some delays in getting documents from third parties

23     as well.  I'm anticipating some delays with this rolling

24     production.

25             THE COURT:  Right.
```

HaqWedwCredacted

1          MR. BURSOR:  And I don't know what those delays are

2     going to be, but at some point it is very likely that we're

3     going to come to you to request scheduling relief because of

4     all these delays.

5          THE COURT:  Again, I think I will have to check with

6     Judge Torres about that.  I'm looking for her order now.  The

7     order she issued says you shall address all discovery disputes

8     to me.  I make a distinction between that and a referral from

9     her for general pretrial supervision, which would enable me to

10    extend discovery or whatever.  I would think in the first

11    instance a request of that kind should go to her since she's

12    the one who issued the schedule in the first place, and all she

13    has tasked me with is dealing with discovery disputes, not

14    scheduling matters.  If she wants to obviously refer that to

15    me, that's fine, but I think if you are going to seek that

16    relief, I would seek it from her in the first instance.

17         MR. BURSOR:  Understood.

18         THE COURT:  And then obviously if she wants me to

19    address it in part because it may be emanating as a result of

20    matters before me, I'm happy to deal with that.  But she could

21    have referred the case to me for more than simply discovery

22    disputes, and that's not what her order says.  OK?

23         Anything else?

24         All right.  Have a good evening, everyone.

25         (Adjourned)