## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF MICHIGAN NORTHERN DIVISION

| | |
|---|---|
| RICHARD PRATT and LARRY JONES, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>KSE SPORTSMAN MEDIA, INC., d/b/a OUTDOOR SPORTSMAN GROUP, INC.,<br><br>                    Defendant. | Case No. 21-cv-11404-TLL-PTM<br>Honorable Thomas L. Ludington<br>Honorable Patricia T. Morris |

## DEFENDANT'S MOTION FOR JUDGMENT ON THE
## PLEADINGS AND INCORPORATED BRIEF IN SUPPORT

Defendant KSE Sportsman Media, Inc. d/b/a Outdoor Sportsman Group, Inc. ("KSE") respectfully moves this Court for an order dismissing Plaintiffs' Complaint because the statute pursuant to which Plaintiffs have brought their claim, the Michigan Preservation of Personal Privacy Act ("PPPA"), violates the Michigan Constitution.  Plaintiffs' Complaint should also be dismissed because the allegations it asserts show KSE's alleged conduct falls within an enumerated exception to the PPPA.  KSE incorporates its brief in support of this Motion.

KSE's counsel certifies that on August 15, 2022, they communicated in writing to Plaintiffs' counsel, explaining the nature of the relief sought in this Motion

and seeking concurrence in that relief.  During a phone call on August 17, 2022, Plaintiffs' counsel stated that they would oppose this Motion.

Dated: August 19, 2022                    Respectfully submitted,

*/s/ Jonathan E. Lauderbach*
Jonathan E.  Lauderbach (P51313)
WARNER NORCROSS + JUDD LLP
715 East Main Street, Suite 110
Midland MI  48640
(989) 698-3701
jlauderbach@wnj.com

-and-

Mary Quinn Cooper, OBA #11966
Kathy R. Neal, OBA #674
Katie G. Crane, OBA #34575
MCAFEE & TAFT, P.C.
Williams Center Tower II
Two West Second Street, Suite 1100
Tulsa, Oklahoma 74103
(918) 587-0000
(918) 599-9317 (FAX)
maryquinn.cooper@mcafeetaft.com
kathy.neal@mcafeetaft.com
katie.crane@mcafeetaft.com

*Attorneys for Defendant KSE Sportsman*
*Media, Inc. d/b/a Outdoor Sportsman*
*Group, Inc.*

2

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MICHIGAN NORTHERN DIVISION**

| | |
|---|---|
| RICHARD PRATT and LARRY JONES, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>   v.<br><br>KSE SPORTSMAN MEDIA, INC., d/b/a OUTDOOR SPORTSMAN GROUP, INC.,<br><br>           Defendant. | Case No. 21-cv-11404-TLL-PTM<br>Honorable Thomas L. Ludington<br>Honorable Patricia T. Morris |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR
JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND....................................................................................4

    A.   The PPPA and its Federal Equivalent.......................................................4

    B.   2016 Amendment to the PPPA ..................................................................5

    C.   The Data Sharing Business Today............................................................6

    D.   Plaintiffs' Allegations ...............................................................................9

LEGAL STANDARD................................................................................................9

ARGUMENTS AND AUTHORITIES ...................................................................10

I.   KSE is Entitled to Judgment on the Pleadings Because the PPPA is a Special
    Law .......................................................................................................................10

    A.   The PPPA Is a Special Law Because It Treats Retailers of Media
        Differently than Other Retailers .............................................................11

    B.   The PPPA Is A Special Law Because It Irrationally Discriminates
        Against Retailers of Written and Audiovisual Materials.......................13

II.  KSE is Entitled to Judgment on the Pleadings Because the Complaint Shows
    that KSE's Alleged Disclosures Meet the Direct Marketing Exception to the
    PPPA.....................................................................................................................18

    A.   Plaintiffs' Complaint Demonstrate that KSE's Disclosures Were for the
        Exclusive Purpose of Marketing Goods and Services Directly to the
        Consumer ................................................................................................18

    B.   Documents Incorporated by Reference in the Complaint Show KSE
        Provided Written Notice to Its Customers...............................................24

# TABLE OF AUTHORITIES

## Cases

*Am. Axle & Mfg., Inc. v. City of Hamtramck*,
   461 Mich. 352, 604 N.W.2d 330 (2000)..................................................10

*Ass'n of Home Help Care Agencies v. Dep't of Health & Hum. Servs.*,
   334 Mich. App. 674, 965 N.W.2d 707 (2020)......................................11

*Berrylane Trading, Inc. v. Trans. Ins. Co.*,
   754 F. App'x 370 (6th Cir. 2018) .......................................................24

*Boelter v. Hearst Commc'ns, Inc.*,
   269 F. Supp. 3d 172S.D.N.Y. 2017).....................................................8

*Cain v. City of Detroit*,
   2021 WL 5261857 (E.D. Mich. Aug. 11, 2021)..................................10

*Conaway v. Detroit Pub. Sch. Cmty. Dist.*,
   2022 WL 1538392 (E.D. Mich. May 16, 2022) ..................................10

*Coulter-Owens v. Time, Inc.*,
   695 F. App'x 117 (6th Cir. 2017) ...................................... 7, 22, 23, 24

*Coulter-Owens v. Time, Inc.*,
   308 F.R.D. 524 (E.D. Mich. 2015) .................................................6, 7

*Donovan v. FirstCredit, Inc.*,
   983 F.3d 246 (6th Cir. 2020) .............................................................22

*Fremont Reorganizing Corp. v. Duke*,
   811 F. Supp. 2d 1323 (E.D. Mich. 2011) ...........................................25

*Greer v. Motion Water Sports, Inc.*,
   2018 WL 1907449 (M.D. Tenn. Apr. 23, 2018)........................... 20, 21

*Harrisburg Sch. Dist. v. Hickok*,
   761 A.2d 1132 (Pa. 2000) ..................................................................17

*Haynes v. Lapeer Cir. Judge*,
   201 Mich. 138, 166 N.W. 938 (1918)........................................... 10, 15

*JPMorgan Chase Bank, N.A. v. Winget*,
   510 F.3d 577 (6th Cir. 2007) .............................................................10

*Kenkel v. Stanley Works*,
   256 Mich. App. 548, 665 N.W.2d 490 (2003).....................................11

*Louisville/Jefferson Cty. Metro Gov't v. O'Shea's-Baxter, LLC*,
   438 S.W.3d 379 (Ky. 2014) ...................................................................17

*Michelle Hug, Henstock, Inc. v. City of Omaha*,
   749 N.W.2d 884 (Neb. 2008) ...............................................................17

*Montgomery v. Potter*,
   341 P.3d 660 (Okla. 2014)....................................................................17

*People v. DeHart*,
   2022 WL 2285268 (Mich. Ct. App. June 23, 2022)............................14

*People v. Konopka*,
   309 Mich. App. 345, 869 N.W.2d 651 (2015).....................................11

*Perlin v. Time Inc.*,
   237 F. Supp. 3d 623 (E.D. Mich. 2017) ..............................................15

*Ruppel v. Consumers Union of United States, Inc.*,
   2017 WL 3085365 (S.D.N.Y. June 12, 2017) ............................... 23, 24

*Swart v. Pitcher*,
   9 F.3d 109 (6th Cir. 1993) ......................................................................9

*United States v. Health Possibilities, P.S.C.*,
   207 F.3d 335 (6th Cir. 2000). ...............................................................22

## Constitutional Provisions

MI CONST Art. 4, § 29 ...............................................................................10

## Statutes

18 U.S.C. § 2710 ..........................................................................................4
MICH. COMP. LAW § 445.1711 ............................................................... iv, v
MICH. COMP. LAW § 445.1712 ............................................................ 2, 5, 22
MICH. COMP. LAW § 445.1713(d). ................................................... passim
MICH. COMP. LAW § 445.1715 ..............................................................2, 5

## Other Authorities

Black's Law Dictionary (11th ed. 2019) ......................................... 20, 24

## Rules

FED. R. CIV. P. 12(c).................................................................................1, 9
FED. R. CIV. P. 12(h)(2).................................................................................9

iii

## STATEMENT OF ISSUES PRESENTED

1.      Whether Plaintiffs have failed to state a claim upon which relief can be granted because Michigan's Preservation of Personal Privacy Act, MICH. COMP. LAW § 445.1711 *et seq.* (the "PPPA"), is an unconstitutional special law; and,

2.      Whether Plaintiffs have failed to state a claim upon which relief can be granted because the Complaint shows KSE's disclosures fall within the direct marketing exception of the PPPA.

## STATEMENT OF MOST CONTROLLING AUHORITY

The controlling authority for this Motion includes:

1.      MICH. COMP. LAW § 445.1711 *et seq.*

2.      MICH. CONST. Art. 4, § 29

Pursuant to FED. R. CIV. P. 12(c), KSE moves the Court for judgment on Plaintiffs' claims alleging violations of the PPPA.

## INTRODUCTION

When the PPPA was passed in 1988, Madonna was producing hit records and a gallon of gas cost less than a dollar. The internet had not yet been used for commercial purposes, and marketing was accomplished primarily through advertising in traditional media such as on television and in magazines. In the 34 years since, technology and commerce have drastically changed. Most adults now own smart phones with capacities that exceed a computer. Companies monitor consumers' cell phone and computer browsing activity to serve them ads relevant to their interests, and the data sharing industry has capitalized on that tracking to become a multi-billion-dollar business. To put it simply—technology has dramatically shifted historical notions of privacy, and any law that attempts to protect it is tasked with accommodating this ever-changing landscape.

The PPPA was passed after a Supreme Court nominee's video rental list was publicly disclosed in a newspaper article. Innocuous though that list was, legislatures like Michigan's acted swiftly to protect the privacy of individuals, declaring that the PPPA "established as a matter of law that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that

matter." Compl., ECF No. 1, ¶ 21 (internal quotation marks omitted).  The PPPA thus prohibits a retailer of "books or other written materials, sound recordings, or video recordings" from disclosing "information concerning the purchase [] of those materials."  MICH. COMP. LAW § 445.1712.  The PPPA allows for statutory damages, *id.* § 445.1715, and provides an exception if a disclosure is for the "exclusive purpose of marketing goods and services directly to the consumer," *id.* § 445.1713(d).

In 2016, to evolve with advancing technology and notions of privacy, Michigan amended its statute.  The PPPA now permits a disclosure if it is incident to the discloser's ordinary course of business and requires proof of actual damage in order for an individual to sue.  Thus, Michigan is keeping pace with what its consumers expect, and don't expect, when it comes to their privacy.

Plaintiffs, however, sued KSE, a publisher of magazines it sells at retail, alleging that KSE has violated the *pre-amendment* PPPA by disclosing consumer information to companies that participate in the data sharing business.  Plaintiffs' lawsuit highlights the PPPA's inequities that have emerged with the advent of the ability to track consumers' retail habits.  The PPPA only applies to "persons" engaged in the business of selling media, like books, magazines, and/or music, but not to other participants in the data sharing business, such as big-box retailers, monthly subscription services, and state governmental agencies that issue licenses. Plaintiffs allege in their Complaint that the PPPA imposes liability on the magazine

2

publisher, but by its very language, the PPPA does not impose liability on retailers that do not publish books or magazines but that nonetheless disclose information concerning consumer purchasers to participants in the data sharing business. The aim of the PPPA is to protect individual privacy, but there is no rational basis for subjecting a company that discloses the purchase of a magazine to liability while exempting a company that discloses the purchase of other goods or services.

What's more, the totality of the allegations in the Complaint demonstrate that KSE's conduct falls into the direct marketing exception of the PPPA, which permits a disclosure if it is for the exclusive purpose of marketing. Plaintiffs argue that KSE does not fall into the exception because KSE discloses subscriber information to earn revenue. But, Plaintiffs also allege the players in the data sharing business, to whom KSE allegedly unlawfully disclosed purchaser information, exist for one purpose: to aid the discloser or recipient to secure more business from existing customers or new business from potential customers, *i.e.,* to market. In fact, marketing means that the marketer at-issue is *selling,* or in layman's terms, earning revenue. Therefore, because Plaintiffs allege KSE is undertaking disclosures to gain revenue by selling, *i.e.,* marketing, consumer goods to consumers, Plaintiffs cannot state a claim.

For these reasons, and those detailed herein, Plaintiffs' claims should be dismissed. The PPPA violates the Michigan Constitution because it treats retailers of media arbitrarily, potentially subjecting them to billions of dollars of liability

based on their participation in an industry in which non-media retailers participate in and profit from with impunity.   In the event the Court declines to find the PPPA an unconstitutional special law, Plaintiffs' own allegations demonstrate that KSE's conduct falls into the direct marketing exception to the PPPA.

## FACTUAL BACKGROUND

### A.    *The PPPA and its Federal Equivalent*

In 1988, the United States Congress enacted the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710 *et seq.*, after a newspaper published a profile containing the titles of 146 films rented by Supreme Court nominee Judge Robert H. Bork.  As detailed in Plaintiffs' Complaint, Members of the United States Senate championed the new privacy legislation because "records of consumers' purchase and rental of audiovisual and publication materials offer a window into our loves, likes, and dislikes[.]" Compl. ¶ 15 (internal quotation marks omitted).

A few months later, Michigan enacted its own version, the PPPA, finding the passage "established as a matter of law that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Id.* ¶ 21.  The PPPA, as originally enacted, thus states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or

4

> information concerning the purchase, lease, rental, or borrowing
> of those materials by a customer that indicates the identity of the
> customer.

MICH. COMP. LAW § 445.1712.  As is obvious from the statutory language and as relevant to KSE, a publisher of magazines, the PPPA prohibits disclosure of information by "a person" that retails "written materials" from identifying to a third-party an individual as a purchaser of those materials.  The PPPA does not, however, prohibit the disclosure of information identifying purchases of non-media materials.

The PPPA also provides exceptions that allow for the disclosure of the consumer's identifying information.  Relevant here, the direct marketing exception exempts a disclosure "[i]f the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer," so long as the discloser "inform[s] the customer by written notice that the customer may remove his or her name at any time by written notice" to the discloser. *Id.* § 445.1713(d).

B.    *2016 Amendment to the PPPA*

In 2016, the Michigan legislature drastically amended the PPPA.  The amendment changed the direct marketing exception, broadening the exemption for the disclosure of identifying information if the disclosure is "incident to the [discloser's] ordinary course of business." MICH. COMP. LAW § 445.1713(d).  The amendment also no longer allows an individual to sue for statutory damages. *Id.* at § 445.1715.  Because it would be difficult for Plaintiffs to maintain even a cause of

5

action, much less a class action, with these amendments, they have elected to bring suit under the pre-amendment PPPA.[1] *See* Compl. ¶ 1 n.2.

    C.    *The Data Sharing Business Today*

During the Class Period,[2] consumer data was valuable, and a variety of companies that did *not* retail "written materials" provided personal information about individuals, like the Named Plaintiffs, to data aggregators, data cooperatives, and third-party advertisers without penalty under the PPPA. *See* Compl. Ex. G, ECF No. 1-8, at 1 (explaining that a data aggregator's customers have included Wells Fargo, HSBC, E*Trade, Toyota, Ford, and Macy's, or "just about any major company looking for insight into its customers"). The purpose of these disclosures: "to sell you stuff." *See* Compl. Ex. F, ECF No. 1-7, at 2.

The Complaint alleges that KSE "disclosed mailing lists containing Plaintiffs' Private Reading Information to data aggregators [], who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to [KSE]." Compl. ¶ 62. Appended information includes "the subscriber's age, income level, ethnicity, marital status and health status, among other information." *Coulter-Owens v. Time, Inc.*, 308 F.R.D. 524, 528

---

[1] Any reference to the "PPPA" hereafter shall mean the pre-amendment PPPA.

[2] The "Class Period" is defined as six-years prior to the date Plaintiffs brought suit up to and until the amendment to the PPPA, or from June 15, 2015 to July 30, 2016.

(E.D. Mich. 2015); *see also* Compl. ¶ 27 ("If you are an American adult, the odds are that [data aggregators] know [] things like your age, race, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."). The demographic information that a publisher like KSE receives back from a data aggregator is collected from other companies that have contributed data showing "age, race, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams." Compl. ¶ 27. As explained by the Sixth Circuit in *Coulter-Owens,* a data aggregator "enhances [] subscriber lists with personal or demographic information obtained elsewhere." 695 F. App'x 117, 118 (6th Cir. 2017).

The Complaint alleges that the second type of disclosure at issue is KSE's alleged provision of subscriber information to "data cooperatives, who in turn gave [KSE] access to their own mailing list databases." Compl. ¶ 63. These data cooperatives collect information contributed by companies across every business line imaginable, such as big banks, retailers, and media. *See* Compl. Ex. G, ECF No. 1-8, at 4 (explaining that a data cooperative's customers include "Citibank, JPMorgan Chase, Target, Walgreens and others"). Publishers like KSE can contribute to cooperative databases to "take advantage of the information contributed to the database by other companies." *Coulter-Owens,* 308 F.R.D. at 529. In other words, "[a] data cooperative allows a company to receive personal

7

information of potential new customers in exchange for submitting information about their current or past customers." *Boelter v. Hearst Commc'ns, Inc.,* 269 F. Supp. 3d 172, 181 (S.D.N.Y. 2017).

Lastly, the Complaint alleges that KSE "rented and/or exchanged its mailing lists" to "third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes." Compl. ¶ 64. This is accomplished through a list broker, which matches "buyers and sellers of data." Compl. Ex. K, ECF No 1-12, at 4. Paragraph 2 of the Complaint shows an example of this direct mail business, in which KSE is offering to sell its list of subscribers to direct-mail advertisers. *See* Compl. ¶ 2.

Data aggregators, data cooperatives, and direct-mail advertisers use all of the information they collect to, as explained in an exhibit attached to Plaintiff's Complaint, "sell you stuff." Compl. Ex. F, ECF No. 1-7, at 2; *see also* Compl. Ex. G, ECF No. 1-8, at 5 (explaining that companies purchase data from data aggregators and/or data cooperatives "because they want to hold on to their best customers or find new ones – or both"); *see also id.* ("A bank that wants to sell its best customers additional services, for example, might buy details about those customers' social media, Web and mobile habits [from data aggregators and/or data cooperatives] to identify more efficient ways to market to them.").

D.    *Plaintiffs' Allegations*

Plaintiffs allege that KSE disclosed detailed information about Plaintiffs' *Guns & Ammo, RifleShooter,* and *Handguns* magazine subscriptions to: (1) data aggregators: (2) data cooperatives; and (3) direct-mail advertisers.  Compl. ¶¶ 1, 62-64.  "As a result, Plaintiffs have received a barrage of unwanted junk mail."  *Id.* ¶ 1.  As a hypothetical example, Plaintiffs allege that: "Anyone could buy a customer list provided by [KSE] that contains the names and addresses of all women *Guns & Ammo* subscribers who are over the age of 40, possess a hunting license, and make over $80,000 per year." *Id.* ¶ 7.

Insofar as the PPPA's direct marketing exception, Plaintiffs allege that KSE's disclosures were made to participants in the data sharing business "in order to increase [KSE]'s revenue," and thus, "were not made for the exclusive purpose of marketing goods [] directly to Plaintiffs and the members of the Class." *Id.* ¶ 72.

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).[3] "A motion for judgment on the pleadings . . . is governed by the same standards applicable to a motion to dismiss pursuant to 12(b)(6)." *Cain v. City of Detroit*, 2021 WL 5261857,

---

[3] KSE's previous filing of a 12(b)(6) Motion does not preclude this one. *See* FED. R. CIV. P. 12(h)(2); *see also Swart v. Pitcher*, 9 F.3d 109 (6th Cir. 1993).

at *1 (E.D. Mich. Aug. 11, 2021). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true[.]" *Conaway v. Detroit Pub. Sch. Cmty. Dist.*, 2022 WL 1538392, at *1 (E.D. Mich. May 16, 2022) (citation omitted). A party is entitled to judgment on the pleadings "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007) (citation omitted).

## ARGUMENTS AND AUTHORITIES

I.  <u>**KSE is Entitled to Judgment on the Pleadings Because the PPPA is a Special Law**</u>

Under the Michigan Constitution, "[t]he legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general can be made applicable shall be a judicial question." MI CONST Art. 4, § 29. A general law, as opposed to a special one, "includes all persons, classes and property similarly situated and which come within its limitations." *Am. Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352, 359, n.5, 604 N.W.2d 330, 334 (2000). Moreover, Michigan courts recognize the constitutional deficiencies of special laws:

> [I]f [legislation]fails to include and affect alike all persons of the same class, and extends immunities or privileges to one portion and denies them to others of like kind, by unreasonable or arbitrary subclassification, it comes within the constitutional prohibition against class legislation.

*Haynes v. Lapeer Cir. Judge*, 201 Mich. 138, 141–42, 166 N.W. 938, 940 (1918)).

10

Michigan courts generally conduct an equal protection analysis to determine the constitutionality of an alleged special law. *See Kenkel v. Stanley Works*, 256 Mich. App. 548, 564, 665 N.W.2d 490, 500 (2003). "In a challenge brought under the Equal Protection Clause . . . a defendant must show that [1] he or she was treated differently than other persons who were similarly situated and [2] that there exists no rational basis for such disparate treatment." *People v. Konopka*, 309 Mich. App. 345, 367, 869 N.W.2d 651, 665 (2015). "The party asserting an equal-protection violation must show that the policy is arbitrary and wholly unrelated in a rational way to the objective of the policy." *Ass'n of Home Help Care Agencies v. Dep't of Health & Hum. Servs.*, 334 Mich. App. 674, 693, 965 N.W.2d 707, 718 (2020) (citation and quotation marks omitted).

### A.   *The PPPA Is a Special Law Because It Treats Retailers of Media Differently than Other Retailers*

The first step of the equal protection analysis requires KSE to show that it is being treated differently than other similarly situated persons. Because the PPPA applies exclusively to businesses that retail written or audiovisual materials, but not to businesses that retail other consumer goods, KSE has met this burden.

The PPPA and laws like it were passed in the late 1980s because a high-profile individual's video rental history was publicly disclosed, and there was widespread public support for privacy protection of an individual's media choices. Fast forward more than 30 years, and the PPPA only applies to magazine publishers and other

11

media retailers' participation in a data sharing business that the Michigan legislature could not have envisioned at the time of the statute's passage.  For example, consumers today can subscribe to a variety of products just like consumers can subscribe to a magazine, *e.g.,* Stitch Fix, Nuuly, and Rent the Runway are clothing rental retailers that collect information about a consumer's clothing size and style, brand and color preferences, and/or events attended; Home Chef, HelloFresh, and Blue Apron are meal delivery retailers that collect information about a consumer's eating habits, food likes and dislikes, food allergies, and/or family demographics; Adore Me and Spicy Subscriptions are lingerie and/or adult intimacy retailers that collect information about a consumer's sexual orientation and preferences. These businesses are noticeably not subject to liability under the PPPA.  The law, on its face, discriminates in favor of a selected group—*i.e.*, companies that sell any product *other than* books, written materials, sound recordings, or video recordings.

Illustratively, Plaintiffs' counsel currently have multiple lawsuits pending pursuant to the statute, all against retailers of media, but not against retailers of any other consumer goods.  *See* Ex. 1, *Batts v. Gannet Co.,* 22-CV-10685 (E.D. Mich.), Am. Compl., ECF No. 17, ¶ 1 (alleging disclosure of "Plaintiff's *USA Today* newspaper subscription"); Ex. 2, *Ulsh et al. v. Farm Journal Inc., d/b/a Farm Journal Media,* 21-CV-11811 (E.D. Mich.), Am. Compl., ECF No. 32, ¶ 1 (alleging disclosure of "Plaintiffs' *Farm Journal* magazine subscriptions").  Of those that have

been brought by Counsel for Plaintiffs and have settled on a class-wide basis, all were against retailers of magazines. *See, e.g., Ex. 3, Raden et al. v. Martha Stewart Living Omnimedia, Inc.,* 16-CV-12808 (E.D. Mich.), Final Judgment and Order of Dismissal with Prejudice, ECF No. 54 (certifying for settlement class of subscribers to *Martha Stewart Living* or *Martha Stewart Weddings* magazines).

Magazine publishers, and other retailers of consumer media, are similarly situated as other retailers of non-media consumer goods and services because they all sell goods at retail and actively participate in and profit from the data sharing business in which their disclosures reveal a private matter "not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." Compl. ¶ 21.  As detailed above, data aggregators, data cooperatives, and direct-mail advertisers receive personal information about consumers from all sorts of companies—some are retailers of media, and others are not—and append it to data already in its possession (data aggregators) or use it to market to their customers or potential customers (data cooperatives and direct-mail advertisers). Thus, the PPPA fails to include and affect alike all persons of the same class, extending immunities and privileges to those non-media retailers who participate in data sharing, but denying those same privileges to media retailers like KSE.

B.     *The PPPA Is A Special Law Because It Irrationally Discriminates*

13

*Against Retailers of Written and Audiovisual Materials*

The second step in the equal protection analysis requires KSE to demonstrate that the PPPA's statutory classification "is without reasonable justification." *People v. DeHart*, 2022 WL 2285268, at *3 (Mich. Ct. App. June 23, 2022). The Michigan legislature's decision to exclude "person[s]" from the PPPA that do not retail written materials or audiovisual materials is irrational and inequitable. Despite the legislature's intentions to avoid a similar privacy violation as had been experienced by Judge Bork, the PPPA violates Michigan's Constitution because there is no rational basis for only holding those who sell some consumer goods liable given the general privacy interest at stake.

In Plaintiffs' hypothetical example from the Complaint, they allege that "[a]nyone could buy a customer list provided by [KSE] that contains the names and addresses of all women *Guns & Ammo* subscribers who are over the age of 40, possess a hunting license, and make over $80,000 per year." Compl. ¶ 7. But, the fact that these hypothetical subscribers are over age 40, possess a hunting license, and make over $80,000 a year cannot be gleaned from their subscription to the at-issue magazine, or from any purchase by them of a book, written material, song, or video recording. Instead, such information has been collected about those individuals elsewhere, from other companies or agencies that collect demographics about an individual's age, licensures, and income, and then provide it to data

14

aggregators and data cooperatives.  A law that arbitrarily punishes the company that

discloses that the hypothetical individuals subscribed to *Guns & Ammo,* but doesn't

the companies that disclosed the individuals' sex, age, licensures, and income level

extends immunities to "one portion and denies them to others of like kind, by []

arbitrary subclassification." *Haynes*, 201 Mich. at 141, 166 N.W. at 940.

The irrationality of the PPPA is especially clear in Plaintiffs' hypothetical

when considering the interest at stake—the preservation of privacy.  "The [PPPA]'s

plain language and legislative history demonstrate that it was created by [the

Michigan] legislature to protect individual consumers from certain disclosures of

their personal information." *Perlin v. Time Inc.,* 237 F. Supp. 3d 623, 640 (E.D.

Mich. 2017) (internal quotation marks and citations omitted).  Information gathered

about individuals, such as their age, licensures, and income level, is the very

definition of personal, and the fact that the company that discloses that information

is not subject to a $5,000 statutory penalty, but the magazine publisher who disclosed

far less personal information is, is unreasonable.

As explained by the Senators who passed the federal VPPA, an individual's

purchase of videos or written materials "offer a window into our loves, likes, and

dislikes." Compl. ¶ 15.  The same is true of an individual's purchase of, for example,

a hunting license.  It offers a window into their love of and passion for hunting the

same way that individuals' purchase of, for example, *Guns & Ammo* magazine

could.  Senator Leahy said in regards to the federal legislation that purchases of audiovisual materials "are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes." Compl. ¶ 20.  It may seem, on first blush, that books, movies, and songs "say more" about an individual than an individual's purchase of other products.  For example, if an individual purchased a book about parenting, it could say a "great deal" about that individual's "dreams and ambitions" to start a family. But, couldn't the purchase of a stroller say the same thing about that individual's hopes and dreams?   The examples are endless. Purchase of a book about trucks versus the actual truck; purchase of a book about financial planning versus enrollment in a 401(k); purchase of a cookbook versus the kitchen equipment to make the recipe.  Books, and movies, and songs are special because they *can be* art.  But the purchase of them—that's just consumerism.

The Michigan legislators reasoned, in passing the PPPA, that "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Id.* ¶ 21. The same is true of a person's choice to subscribe to a monthly delivery of high-end cuts of meat, *i.e.,* Butcher Box, which could provide fodder for a "gossipy publication" that such an individual is not a vegetarian and a capricious spender.   The same is true of a person's choice to subscribe to a box

delivered monthly to treat hair loss, *i.e.,* Hims, which could provide information for a potential employer that the individual is balding.

In short, personal data about all consumer purchases was provided to data appenders, data cooperatives, and direct-mail advertisers during the Class Period. The PPPA punishes the company that disclosed the purchase of the book about Claude Monet, but not the company that disclosed the purchase of a Water Lilies print. In the current data sharing landscape, what someone is reading, watching, or listening to does not reveal anything more intimate about their personhood that a purchase of other goods sold at retail does. Thus, the PPPA cannot withstand rational basis scrutiny.[4]

---

[4] *See cf. Montgomery v. Potter*, 341 P.3d 660, 662 (Okla. 2014) (holding that a statute preventing uninsured motorists from recovering damages for pain and suffering was a special law because it restricted damages for uninsured drivers "while the general class of automobile accident victims is not prevented from the recovery of damages for pain and suffering"); *Louisville/Jefferson Cty. Metro Gov't v. O'Shea's-Baxter, LLC*, 438 S.W.3d 379, 386 (Ky. 2014) (legislation prohibiting retail drink license to an applicant located in a "combination business and residential area" if another "similar establishment" was located within 700 feet was a special law); *Harrisburg Sch. Dist. v. Hickok*, 761 A.2d 1132, 1135-36 (Pa. 2000) (holding that legislation applying to a school district "with a history of low test performance" was a special law, as the law applied only to Harrisburg, yet there was no rational basis for treating Harrisburg differently than other failing school districts); *Michelle Hug, Henstock, Inc. v. City of Omaha*, 749 N.W.2d 884, 890 (Neb. 2008) (holding that ordinance providing exemptions to a smoking ban—including bars, keno establishments, horseracing simulcasting locations, and tobacco retail outlets—was a special law because "[n]othing in the ordinance's stated purpose would explain why employees of the exempted facilities or members of the public who wish to patronize those establishments are not entitled to breathe smoke-free air or to have their health and welfare protected").

II.   **KSE is Entitled to Judgment on the Pleadings Because the Complaint Shows that KSE's Alleged Disclosures Meet the Direct Marketing Exception to the PPPA**

In the alternative, KSE is entitled to judgment on the pleadings because the Complaint shows KSE's disclosures meet the direct marketing exception to the PPPA.  Section 445.1713(d) of the PPPA provides that any actionable disclosures are exempted so long as: (1) "the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer; and (2) "[t]he person disclosing the information shall inform the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information."  Because the allegations in the Complaint and documents incorporated by reference demonstrate that KSE's alleged disclosures meet these two criteria, Plaintiffs' claims should be dismissed on the pleadings.

A.   *Plaintiffs' Complaint Demonstrate that KSE's Disclosures Were for the Exclusive Purpose of Marketing Goods and Services Directly to the Consumer*

Plaintiff's Complaint alleges KSE's disclosures during the Class Period were made to three players in the data sharing business—data aggregators, data cooperatives, and direct-mail advertisers like "organizations soliciting monetary contributions, volunteer work, and votes"—in "order to increase [KSE's] revenue." Compl. ¶ 72.  Thus, Plaintiffs contend, KSE's "disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the

18

members of the Class." *Id.*  By these very allegations, however, Plaintiffs have shown that any alleged disclosures by KSE fit within the exception because the purpose of marketing is to earn revenue.

### 1.   KSE's Disclosures to Data Aggregators Were Allegedly For the Purpose of Marketing to KSE's Existing Customers

Plaintiffs first allege that KSE disclosed identifying information of its subscribers to data aggregators, which as explained *supra,* are companies that collect data from a variety of media and non-media companies and then append it to the discloser's data to make it more valuable to the discloser. *Id.* ¶ 72.  However, Plaintiffs also allege that KSE is undertaking the disclosures to data aggregators so it can promote its magazines.  *See* Compl. Ex. G, ECF No. 1-8, at 5 (explaining that companies purchase data from data aggregators "because they want to hold on to their best customers"); *see also id.* ("A bank that wants to sell its best customers additional services, for example, might buy [data from data aggregators] to identify more efficient ways to market to them.").

Plaintiffs contend that the reason KSE undertakes these disclosures is to earn revenue.  But, any revenue allegedly earned by KSE by enhancing its own data will be via increased sales of its magazines to existing customers, *i.e.,* via marketing. Black's law dictionary defines "marketing" as: "1. The act or process of promoting and *selling,* leasing, or licensing products or services. . . .  3. The area of study concerned with the promotion and *selling of products or services*." MARKETING,

Black's Law Dictionary (11th ed. 2019) (emphasis added).  Synonyms for marketing include "retailing" and "selling." Insert those words into the PPPA's exception instead of "marketing," and it reads: "If the disclosure is for the exclusive purpose of [retailing or selling] goods and services directly to the consumer."

Marketing is not a charitable enterprise.  In fact, marketing is done *expressly* to make a profit or promote a service. The choice of the word "marketing" in PPPA is telling.  If the Michigan legislature meant that a disclosure is not exempted if the person making it might obtain a profit from it, then they would have written that.  Instead, the legislature provided for a common-sense exception in which KSE's alleged disclosures squarely fit. The words "exclusive purpose" do not diminish the import of the word "marketing." KSE allegedly undertaking the disclosures for the exclusive purpose of making a profit is the same as KSE undertaking the disclosures for the exclusive purpose of marketing because for-profit companies market for the exclusive purpose of making a profit.

The case of *Greer v. Motion Water Sports, Inc.* is instructive. 2018 WL 1907449 (M.D. Tenn. Apr. 23, 2018).  There, the plaintiff sued the defendant, a non-manufacturer seller of a life vest, after the decedent died in a boating accident. The plaintiff argued the Tennessee's Products Liability Act of 1978 ("TPLA"), which provides protections for non-manufacturing sellers, did not apply because the defendant was ***not*** engaged in marketing when it displayed the at-issue life vest next

to a Coast Guard approved life vest at its retail location. *Id.* at **1-2.  The court thus analyzed whether the TPLA's definition of "marketing" encompassed the defendant's conduct, because if it did, then the plaintiff's claim would be precluded.  The court found that because the display of the life vest constituted "the business of *selling* a product," *i.e.,* marketing, the defendant's conduct "constitutes marketing," thus precluding the plaintiff's claim.  *Id.* at **2-3.

Obviously, the TPLA is a different statute than the PPPA. However, the *Greer* court's interpretation of "marketing" as "the business of *selling* a product" precluded the plaintiff's claim on the pleadings based on that definition.  The "business of *selling* a product" necessarily includes the business of earning revenue. Therefore, "marketing" as is used in § 445.1713(d) includes any motivation by KSE, as alleged by Plaintiffs, to earn revenue.  Any alleged disclosures by KSE to data aggregators thus fall within the direct marketing exception to the PPPA.

### 2.   KSE's Disclosures to Data Cooperatives Were for the Alleged Purpose of Marketing to "the Consumer"

Plaintiffs also allege KSE disclosed identifying information of its subscribers to "data cooperatives" to gain access to the data cooperative's "mailing list databases." *See* Compl. ¶¶ 63, 72.  Plaintiffs allege KSE wants access to the data cooperative's mailing lists so it can access potential new customers to which it hopes to sell its magazines. *See* Compl. Ex. F, ECF No.1-8 at 5 ("Clients generally buy this data because they want to . . . find new [customers].").  As explained *supra,* KSE

hopes to market to potential new customers so it can earn a profit, and therefore, KSE's alleged disclosure of its subscriber's information to data cooperatives is not actionable under the PPPA. *Coulter-Owens*, 695 F. App'x at 118 (explaining magazine publisher at-issue was a member of the cooperative because "it is valuable to [the publisher's] *own marketing endeavors*" (emphasis added)).

Plaintiffs contend that disclosures to data cooperatives do not fit within the direct marketing exception because the disclosure must be done for the purpose of "marketing goods and services directly to Plaintiffs and the members of the Class." Compl. ¶ 72. But, that's not what the statute says. Section 445.1713(d) does not state that the disclosure must be for the exclusive purpose of "marketing goods and services directly" to the *discloser's existing customers*, which would parrot the language of § 445.1712, which prohibits the disclosure of a "customer's" identifying information, or the language in the rest of § 445.1713(d), which states that the written notice must be to the "customer." Instead, the exception provides for marketing to "the consumer" in general, whether it be a current or potential customer of the discloser. Where, as here, "the language of the statute is clear, the court applies the statute as written," *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 253 (6th Cir. 2020), and "the judicial inquiry is at an end," *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 339 (6th Cir. 2000).

The legislative history of the amended PPPA evidences this statutory

interpretation. The legislators described that the amendment was meant to "clarify" that the PPPA does not prohibit disclosures if done to market "goods and services to customers *or potential customers*." *See* Ex. 4, Enrolled Senate Bill No. 490, Amendment to the PPPA (emphasis added).   KSE's alleged disclosures to data cooperatives were, according to Plaintiff, done to gain access to potential customers, which just happens to earn the company revenue.

3.   KSE's Disclosures to Direct-Mail Advertisers Were for the Alleged Purpose of Marketing to "the Consumer"

The last category of at-issue disclosures is KSE's alleged rental of its subscriber list to "third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes."   Compl. ¶ 64.   Such list rentals, even to political or charitable organizations, fall within the direct marketing exception of the PPPA.

Any disclosures via the list rental business are done for the purpose of marketing to the discloser's customers.   *See Coulter-Owens,* 695 F. App'x at 118 (explaining the discloser rents its "subscriber lists to other enterprises (e.g., companies, political groups, charities)" for the enterprises' marketing efforts). Plaintiffs may point to *Ruppel v. Consumers Union of United States, Inc.,* in which the court held on a motion to dismiss that the defendant's disclosures did not satisfy the direct marketing exception because the defendant sold its list to non-profits and organizations soliciting donations.   2017 WL 3085365, at *2 (S.D.N.Y. June 12,

2017).  But the alleged disclosure of information to charity or political organizations, *see* Compl. ¶ 72, is also a disclosure for the exclusive purpose of marketing because such entities are utilizing the information to "promote" a service. *See* MARKETING, Black's Law Dictionary (11th ed. 2019) (defining "marketing" as "the act or process of promoting . . . services").[5]

      B.    *Documents Incorporated by Reference in the Complaint Show KSE Provided Written Notice to Its Customers*

The direct marketing exception also requires that "[t]he person disclosing the information [] inform the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information." MICH. COMP. LAW § 445.1713(d).  Incorporated by reference in the Complaint are the written notices in *Guns & Ammo, RifleShooter,* and *Handguns* magazines, *see* Exs. 5-7,[6] which contain the following disclosure:

---

[5] Attorneys previously representing parties pursuing claims like those pursued here have admitted disclosures made in furtherance of the direct-mail business meet the direct marketing exception. *Coulter-Owens,* 695 F. App'x at 120.

[6] KSE may rely on written notice included in these magazines because they were referenced in the Complaint and are central to Plaintiffs' claims in this case. *See Berrylane Trading, Inc. v. Trans. Ins. Co.*, 754 F. App'x 370, 378 n.2 (6th Cir. 2018). *First*, the Named Plaintiffs each allege that they were never provided "any written notice that [KSE] rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out." Compl. ¶¶ 9, 10. Thus, it cannot be argued that Plaintiffs do not reference the magazines' written notices, as the "notice" they refer to was included in each magazine. *See id.* 378 n.2 (holding that even an indirect reference to a document is sufficient for a defendant to incorporate a document in a Rule 12 motion). *Second*, the written notices contained in the

OCCASIONALLY, our subscriber list is made available to reputable firms offering goods and services that we believe would be of interest to our readers. If you prefer to be excluded, please send your current address label and a note requesting to be excluded from these promotions to: **Outdoor Sportsman Group,** 1040 6th Ave., 12th Floor, New York, NY 10018-3703, Attn: Privacy Coordinator

KSE thus informed its subscribers that it was participating in data sharing, and that individuals could opt out of it by "written notice to the person disclosing the information." MICH. COMP. LAW § 445.1713(d).

## CONCLUSION

For the foregoing reasons, KSE requests that the Court grant its Motion for Judgment on the Pleadings.

Dated: August 19, 2022                     Respectfully submitted,

                                            */s/ Jonathan E. Lauderbach*
                                            Jonathan E.  Lauderbach (P51313)
                                            WARNER NORCROSS + JUDD LLP
                                            715 East Main Street, Suite 110
                                            Midland MI  48640
                                            (989) 698-3701
                                            jlauderbach@wnj.com

---

magazines are central to Plaintiffs' claims. Indeed, the PPPA requires KSE to inform its subscribers that it was disclosing their information if it intends to utilize it for marketing, and Plaintiffs allege that KSE failed to do just that. The Court should not allow Plaintiffs' failure to attach documents central to their claims to convert the Motion.  *See Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1334 (E.D. Mich. 2011) ("[W]here the plaintiff does not refer directly to given documents in the pleadings, if those documents govern the plaintiff's rights and are necessarily incorporated by reference then the motion need not be converted to one for summary judgment.").

## <u>CERTIFICATE OF SERVICE</u>

Jonathan E. Lauderbach  states that on August 19, 2022, he did serve a copy of this *Motion for Judgment on the Pleadings* via United States District Court electronic transmission.


<u>/s/ Jonathan E. Lauderbach</u>
Jonathan E. Lauderbach