**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION**

| | |
|---|---|
| RICHARD PRATT and LARRY JONES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KSE SPORTSMAN MEDIA, INC.,<br><br>Defendant. | Case No. 21-cv-11404-TLL-PTM<br><br>Honorable Thomas L. Ludington |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

**ISSUE PRESENTED**

1.     Whether Michigan's Preservation of Personal Privacy Act ("PPPA") is an impermissible "special law" in violation of the Michigan Constitution despite the fact that the statute clearly meets rational scrutiny?

      Plaintiffs answer:  No.

2.     Whether Defendant is entitled to judgment as a matter of law pursuant to the PPPA's direct-marketing exception when Defendant failed to raise the exception as an affirmative defense and the Complaint specifically alleges that Defendant disclosed Plaintiffs' Personal Reading Information for purposes other than marketing goods or services directly to them?

      Plaintiffs answer:  No.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

- *Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017)

- *Lundstrom v. Ellsworth Twp.*, 162 N.W. 990 (Mich. 1917)

- *Rohan v. Detroit Racing Ass'n*, 22 N.W.2d 433 (Mich. 1946)

- *Straus v. Elless Co.*, 222 N.W. 752 (Mich. 1929)

- MCL § 445.1713(d)

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………1

FACTUAL ALLEGATIONS OF THE COMPLAINT……………………………2

APPLICABLE LEGAL STANDARD…………………………………………..3

ARGUMENT …………………………………………………………………4

    I.     The PPPA Is a Constitutional Statute of General Application ...………4

           A.    The PPPA is constitutional……………………………………4

           B.    Defendant's arguments to the contrary fail………………...…10

    II.    Defendant Is Not Entitled to Judgment as a Matter of Law Pursuant to the PPPA's Direct-Marketing Exception……………………………14

CONCLUSION…………………………………………………………………...25

iii

# TABLE OF AUTHORITIES

## Cases

*Ass'n of Home Help Care Agencies v. Dep't of Health & Hum. Servs.*,
    965 N.W.2d 707 (Mich. App. 2020) ....................................................................8
*Bible Believers v. Wayne Cty.*,
    2013 WL 2048923, at *13 (E.D. Mich. May 14, 2013) ....................................12
*Boelter v. Advance Magazine Publishers Inc.*,
    210 F. Supp. 3d 579 (S.D.N.Y. 2016) ...................................................... 11, 16, 20
*Boelter v. Hearst Commc'ns, Inc.*,
    192 F. Supp. 3d 427 (S.D.N.Y. 2016) ...................................................... 14, 16, 17
*Com. Money Ctr., Inc. v. Illinois Union Ins. Co.*,
    508 F.3d 327 (6th Cir. 2007) ...............................................................................3
*Coulter-Owens v. Time Inc.*,
    695 F. App'x 117 (6th Cir. 2017) ...................................................................3, 21
*Crego v. Coleman*,
    615 N.W.2d 218 (Mich. 2000) ............................................................................5
*E.E.O.C. v. J.H. Routh Packing Co.*,
    246 F.3d 850 (6th Cir. 2001) ...........................................................................3, 16
*Gen. Motors Corp. v. Dep't. of Treasury*,
    803 N.W.2d 698 (Mich. App. 2010) ....................................................................7
*Greer v. Motion Water Sports, Inc.*,
    2018 WL 1907449 (M.D. Tenn. Apr. 23, 2018) .................................................24
*Harrisburg Sch. Dist. v. Hickok*,
    761 A.2d 1132 (Pa. 2000) ..................................................................................10
*Haynes v. Lapeer Cir. Judge*,
    166 N.W. 938 (Mich. 1918) .................................................................................8
*Houston v. Governor*,
    819 N.W.2d 430 (Mich. App. 2012) ....................................................................7
*Irishman's Lot, Inc. v. Cleary*,
    62 N.W.2d 668 (Mich. 1954) ....................................................................... 4, 5, 9
*Kenkel v. Stanley Works*,
    665 N.W.2d 490 (Mich. App. 2003) ....................................................................8
*Louisville/Jefferson Cty. Metro Gov't v. O'Shea's-Baxter, LLC*,
    438 S.W.3d 379 (Ky. 2014) ...............................................................................10
*Lundstrom v. Ellsworth Twp.*,
    162 N.W. 990 (Mich. 1917) ...................................................................... 4, 8, 13
*Michelle Hug, Henstock, Inc. v. City of Omaha*,
    749 N.W.2d 884 (Neb. 2008) .............................................................................10

*Miller v. Detroit Sav. Bank*,
   286 N.W. 803 (Mich. 1939) ................................................................................6

*Montgomery v. Potter*,
   341 P.3d 660 (Okla. 2014) .............................................................................10

*Newell v. Cent. Michigan Univ. Bd. of Trustees*,
   461 F. Supp. 3d 589 (E.D. Mich. 2020) ........................................................20

*Paskvan v. City of Cleveland Civ. Serv. Comm'n*,
   946 F.2d 1233 (6th Cir. 1991) .........................................................................3

*People v. Babcock*,
   73 N.W.2d 521 (Mich. 1955) ...........................................................................9

*People v. DeHart*,
   2022 WL 2285268 (Mich. Ct. App. June 23, 2022) ........................................9

*People v. Gogak*,
   171 N.W. 428 (Mich. 1919) .............................................................................9

*People v. Konopka*,
   869 N.W.2d 651 (Mich. App. 2015) ................................................................8

*People v. Perlos*,
   462 N.W.2d 310 (Mich. 1990) .........................................................................9

*Rohan v. Detroit Racing Ass'n*,
   22 N.W.2d 433 (Mich. 1946) ................................................................ 6, 8, 11

*Ruppel v. Consumers Union of United States, Inc.*,
   2017 WL 3085365 (S.D.N.Y. June 12, 2017) ..................................... 16, 19, 21

*State v. Wayne Cty. Clerk*,
   648 N.W.2d 202 (Mich. 2002) .........................................................................9

*Straus v. Elless Co.*,
   222 N.W. 752 (Mich. 1929) .................................................................... 5, 9, 11

*Taylor v. City of Saginaw*,
   2020 WL 376453 (E.D. Mich. Jan. 23, 2020) (Ludington, J.) .........................15

*Tribbett v. Vill. of Marcellus*,
   293 N.W. 872 (Mich. 1940) .............................................................................5

*Wayne Cty. Bd. of Comm'rs v. Wayne Cty. Airport Auth.*,
   658 N.W.2d 804 (Mich. App. 2002) ................................................................7

*Williams-Yulee v. Florida Bar*,
   135 S. Ct. 1656 (2015) ...................................................................................12

**Statutes**

Fed. R. Civ. P. 12(b)(6) ........................................................................3
Fed. R. Civ. P. 12(c) ........................................................................3, 20
M.C.L. § 445.1713(d) ................................................................. passim
Michigan Constitution, Article 4, Section 29 ...........................................4

**Other Authorities**

National Lampoon's Christmas Vacation (Hughes Entertainment/Warner
   Brothers 1989) .........................................................................12

**Rules**

Fed. R. Civ. P. 8(c)(1) ........................................................................15

Plaintiffs Richard Pratt and Larry Jones submit this response in opposition to the motion for judgment on the pleadings (ECF No. 44 (the "Motion" or "Mot.")) filed by Defendant KSE Sportsman Media, Inc.

## INTRODUCTION

Discovery in this case has thus far resulted in the production of documents and ESI that are devastating for Defendant.[1] Defendant has now filed this Motion as a last-ditch, hail-Mary attempt to prevail on the pleadings before Plaintiffs are able to certify a class and prevail on the merits. The Motion is completely without merit and should be quickly denied.

The Motion moves for judgment on the pleadings on two grounds: first, that the Michigan Preservation of Personal Privacy Act ("PPPA") is an impermissible "special law" in violation of the Michigan Constitution; and second, that the undisputed facts, as alleged in the pleadings, entitle Defendant to judgment as a matter of law pursuant to the statute's direct-marketing exception. Neither ground stands up against even the slightest scrutiny. Defendant's constitutional challenge fails because the statute clearly meets rational scrutiny. And Defendant's attempt to invoke the direct-marketing exception also fails because Defendant failed to raise the exception as an affirmative defense, but even if it had, the Complaint clearly alleges that Defendant disclosed

---

[1] These materials include, *inter alia*, documents reflecting Defendant's transmissions of Plaintiffs' PRI to a third-party data cooperative, Epsilon Data Management, LLC

1

Plaintiffs' PRI for several purposes having nothing to do with marketing goods or services directly to them, and that Defendant failed to comply with the statutory exception's notice requirement prior to disclosing their information to third parties.

The PPPA does not run afoul of the Michigan Constitution, and Defendant is not entitled to judgment as a matter of law pursuant to the statute's direct-marketing exception. The Motion should be denied.

## FACTUAL ALLEGATIONS OF THE COMPLAINT

Defendant maintains a vast digital database comprised of its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "PRI"), as well as a myriad of other categories of individualized data and demographic information such as age, gender, income, marital status, occupation, and hunting license status. Compl. ¶ 42.

At various times during the pre-July 30, 2016 time period, Defendant disclosed its customers' PRI to data aggregators and appenders, who then supplement that information with additional sensitive private information about each Defendant customer, including his or her age, gender, income, marital status, occupation, and hunting license status. *Id*. Defendant then rents and/or exchanges its mailing lists – which include subscribers' PRI identifying which individuals purchased subscriptions to particular magazines, and can include the sensitive information obtained from data

("Epsilon"), on at least 25 data occasions between October 2015 to June 2016. *See*

2

aggregators and appenders – to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. *Id.* ¶¶ 43, 61-64 (citing Ex. A). By renting, exchanging, or otherwise disclosing the PRI of Plaintiffs and its other Michigan-resident subscribers during the relevant pre-July 30, 2016 time period, Defendant violated the VRPA.

## APPLICABLE LEGAL STANDARD

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The standard of review for a [motion for] judgment on the pleadings [under Rule 12(c)] is the same as that for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001).[2] Courts must view the pleadings in the "light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law." *Com. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). A motion for judgment on the pleadings "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civ. Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

---

Reply, ECF No. 50 (Fraietta Decl. in support of Pls' Mot. to Compel Discovery) ¶3.

## ARGUMENT

The PPPA does not run afoul of the Michigan Constitution, and Defendant is not entitled to judgment as a matter of law pursuant to the PPPA's direct marketing exception found in M.C.L. § 445.1713(d). The Motion should be denied.

## I.    The PPPA Is a Constitutional Statute of General Application

Defendant argues that the PPPA is a "special law" that violates Article 4, Section 29 of Michigan's Constitution by applying to a particular class of persons as opposed to the public at large. Mot. at 10-18. Its argument fails.

### A.    The PPPA is constitutional

Defendant has come nowhere near meeting its heavy burden in seeking to invalidate the legislation. "It is fundamental that one asserting the unconstitutionality of a statute has the burden of proving such contention[.]" *Irishman's Lot, Inc. v. Cleary*, 62 N.W.2d 668, 670 (Mich. 1954). *See also Lundstrom v. Ellsworth Twp.*, 162 N.W. 990, 992 (Mich. 1917) ("unless upon its face convincingly arbitrary, capricious, and unreasonable, it is not for the courts to debate the policy and wisdom of such legislative treatment" because "[i]n cases of doubt, every possible presumption, not clearly inconsistent with the language and subject-matter, is to be made in favor of the constitutionality of the act").

In accordance with the presumption of constitutionality, the Legislature is

---

[2]  Citations and quotations omitted, and emphasis added, unless otherwise noted.

empowered to draw distinctions and limitations in enacting legislations, and "[t]he judicial department may not interfere with such classification when made unless it is clearly unreasonable." *Tribbett v. Vill. of Marcellus*, 293 N.W. 872, 877 (Mich. 1940). As Defendant concedes, it must demonstrate that the Legislature's classification lacks a "rational basis" (Mot. at 11), and "[t]o prevail under [the] highly deferential standard" of this test, a statute's "challenger must show that the legislation is arbitrary and wholly unrelated in a rational way to the objective of the statute," which "does not test the wisdom, need, or appropriateness of the legislation, or whether the classification is made with 'mathematical nicety,' or even whether it results in some inequity when put into practice." *Crego v. Coleman*, 615 N.W.2d 218, 224 (Mich. 2000). "Nor is it necessary that such classification be accurate, scientific, logical or harmonious, so long as it is not arbitrary and will accomplish the legislative design." *Tribbett*, 293 N.W. at 877.

Thus, "[w]hen the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed or to other legitimate proof, that the action is arbitrary." *Cleary*, 62 N.W.2d at 671. *See also Straus v. Elless Co.*, 222 N.W. 752, 753 (Mich. 1929) ("The classification is sufficient if it is practical and

reasonable"; "is not reviewable unless it is palpably arbitrary and unreasonable"; and "[a] lack of abstract symmetry does not matter"); *Miller v. Detroit Sav. Bank*, 286 N.W. 803, 804 (Mich. 1939) ("If any state of facts reasonably can be conceived that would sustain statutory classification, its existence must be assumed.").

Thus, "[i]f the law is general and uniform in its operation upon all [] in like circumstances, it is general in a constitutional sense." *Rohan v. Detroit Racing Ass'n*, 22 N.W.2d 433, 441 (Mich. 1946). "Laws are general and uniform not because they operate on [all] in the State, but because they operate on [all] brought within the relations and circumstances provided for—not because they embrace all of the governed, but because they may embrace all—if [all] governed occupy the position of [all] embraced." *Id*. at 441-42. "[T]he rule is settled that a statute relating to [all] as a class is a general law, but a statute relating to particular[s] of a class is special." *Id.* at 442. "If the object and purpose of the legislation is legitimate and within the terms of the Constitution, the mere fact that there is classification, so long as the law operates equally upon those within the particular class, does not render it unconstitutional." *Id.* "Equal protection of the laws does not prevent a reasonable classification by legislative enactment and the ultimate decision as to the wisdom of such laws rests with the legislature." *Id.* So, a statute "is a general act if it applies uniform rules of conduct for all those…within the scope of its application." *Id.*

As the Michigan Court of Appeals explained in rejecting a challenge to

legislation applying to municipalities based on population, "the fact that an act contains limitations—such as a population threshold—that appear to target a single municipality does not remove the act from general application if it is possible that another municipality or county might someday qualify for inclusion," because "[t]he probability or improbability of other counties or cities reaching the statutory standard of population is not the test of a general law." *Houston v. Governor*, 819 N.W.2d 430, 433 (Mich. App. 2012).[3] In other words: if a statute is written so that it can only apply to specific people or entities, then it is impermissibly special. But if others can fall within the statute through their conduct or circumstances – regardless of how unlikely – the law is general. *See Gen. Motors Corp. v. Dep't. of Treasury*, 803 N.W.2d 698, 713 (Mich. App. 2010) ("The mere fact that a law only applies…to a limited number does not make it special instead of general…If a law is general and uniform in its operation upon all [] in like circumstances, it is general in the constitutional sense"); *Wayne Cty. Bd. of Comm'rs v. Wayne Cty. Airport Auth.*, 658 N.W.2d 804, 834 (Mich. App. 2002) (law applying to single airport general because "other airports can qualify…if their number [] increases to the requisite level on some future date").

Indeed, the Michigan Supreme Court has consistently rejected arguments such as Defendant's—rejecting a special-law challenge to regulations applicable only to

---

[3] In *Houston*, the Court of Appeals found that the redistricting statute at issue was in fact impermissibly specific; the Supreme Court overturned this conclusion, further undermining Defendant's argument. *Houston*, 810 N.W.2d 255.

certain betting practices in *Rohan*. "The evils attendant upon this type of wagering are well known, and by the act in question the legislature in the exercise of its discretion sought to regulate the wagering by confining it to race tracks conducted by licensees," which "was not unreasonable or arbitrary and was within the scope of legislative power and discretion." *Rohan*, 22 N.W.2d at 442. Just as the Legislature there could distinguish between types of gambling, it can distinguish here between different types of subscriptions and data collection processes. *See id.* ("A legislative classification may rest on narrow distinctions," as "[l]egislation is addressed to evils as they may appear, and even degrees of evil may determine its exercise.")[4]

Likewise, in *Lundstrom*, the Supreme Court rejected a special-law challenge to a statute immunizing townships from liability for the failure of specific types of infrastructure caused by particular vehicles over a certain weight limit. *Lundstrom*, 162 N.W. at 992. In *People v. Babcock*, the Michigan Supreme Court rejected a challenge to architect regulations as too narrowly drawn, finding that it did "not deny

---

[4] In contrast, Defendant relies primarily on *Haynes v. Lapeer Cir. Judge*, which held unconstitutional a statute forcing sterilization on certain persons. 166 N.W. 938, 940 (Mich. 1918). Forced sterilization obviously raises a host of constitutional issues absent here. And its other Michigan cases illustrate the weakness of its argument. *Kenkel v. Stanley Works* rejected a special-law challenge such as Defendant's. 665 N.W.2d 490, 500 (Mich. App. 2003). Similarly, *Konopka* and *Home Help Care* both rejected equal protection challenges to statutes. *People v. Konopka*, 869 N.W.2d 651, 666 (Mich. App. 2015); *Ass'n of Home Help Care Agencies v. Dep't of Health & Hum. Servs.*, 965 N.W.2d 707, 719 (Mich. App. 2020). And *DeHart* did not merely reject a challenge to a statutory classification; it quoted *People v. Perlos*, 462 N.W.2d

to defendant the equal protection of the law…because it excludes from its effects architects or engineers working on a temporary basis, not to exceed 60 days, or being engaged in serving the United States, or those operating on interstate or railroad property, and other exceptions noted in the act." 73 N.W.2d 521, 526 (Mich. 1955). And *Straus* upheld statutory interest regulations that distinguished between different types of interest-bearing instruments. *Straus*, 222 N.W. at 753. These cases close the door on Defendant's argument that the Legislature must regulate every activity that poses a risk of a particular harm if it regulates any activity that poses such risk.

Similarly, as discussed above, "population-based statutes have been upheld against claims that they constitute local acts where it is possible that other municipalities or counties can qualify for inclusion if their populations chan." *State v. Wayne Cty. Clerk*, 648 N.W.2d 202, 204 (Mich. 2002) (citing *Cleary*, 62 N.W.2d at 668),[5] just as non-media subscription services could have always gone into the media subscription business. *See also People v. Gogak*, 171 N.W. 428, 430 (Mich. 1919) (rejecting challenge to act authorizing corporations to arm employees as a special law because "[t]he general principle is that equal protection is not denied where the law

310 (Mich. 1990) to confirm the onerous nature of a rational basis challenge. *People v. DeHart*, 2022 WL 2285268, at *3–4 (Mich. Ct. App. June 23, 2022).
[5] Indeed, *State v. Wayne Cty. Clerk* is the proverbial exception that proves the rule: the act was found unconstitutional because it only applied to a specific upcoming election, and no other municipality could attain the requisite verified population in the roughly three weeks remaining before the vote, as no new census would take place within that time. 648 N.W.2d at 204.

9

operates alike upon all [] similarly situated.").[6]

## B.    Defendant's arguments to the contrary fail

Despite this overwhelming jurisprudence, Defendant argues that the PPPA is unconstitutional because *other* sorts of data sales practices pose the same dangers as the ones that it addresses. Defendant concedes that "[i]t may seem, on first blush, that books, movies, and songs 'say more' about an individual than an individual's purchase of other products," and that, "[f]or example, if an individual purchased a book about parenting, it could say a 'great deal' about that individual's 'dreams and ambitions' to start a family." Mot. at 16. "But," it continues, "couldn't the purchase of a stroller say the same thing about that individual's hopes and dreams?" *Id.* Relatedly, Defendant argues that there are other kinds of subscriptions from which data brokers

---

[6] Given the hostility of Michigan law, Defendants rely primarily on decisions in other states applying those states' special-law limitations. Even on their own terms, these foreign cases would not impair PPPA-type statutes. *Montgomery v. Potter*, 341 P.3d 660, 662 (Okla. 2014) found unconstitutional a statute limiting damages recoverable by motorists because they were uninsured. But the PPPA does not distinguish between subscription services depending on their insurance status. *Louisville/Jefferson Cty. Metro Gov't v. O'Shea's-Baxter, LLC*, 438 S.W.3d 379, 386 (Ky. 2014) barred legislation prohibiting liquor licenses for certain establishments if a different "similar establishment" was located nearby. That would be as if the PPPA provisions depended upon whether other subscription services were operating in the same market. *Harrisburg Sch. Dist. v. Hickok*, 761 A.2d 1132, 1135-36 (Pa. 2000) concerned legislation singling out a specific school district "with a history of low test performance." Nothing in the PPPA depends upon the history of any potential defendants' performance or conduct; everyone in the same line of business is treated the same. And *Michelle Hug, Henstock, Inc. v. City of Omaha*, 749 N.W.2d 884, 890 (Neb. 2008) concerned explicit smoking ban exemptions. Defendant's "special law"

might derive information other than those for recorded material. It recognizes the Legislature's concerns that information about subscriptions for written or recorded content could reveal personal information about subscribers, but claims that "[t]he same is true of a person's choice to subscribe to a monthly delivery of high-end cuts of meat, *i.e.*, Butcher Box, which could provide fodder for a 'gossipy publication' that such an individual is not a vegetarian and a capricious spender," while speculating as to the information gleanable from subscriptions for hair loss treatments, meal kits, or erotic paraphernalia. Mot. at 12, 16.

As shown above, Michigan law rejects such arguments, and with good reason. For example, does Defendant contend that *Rohan* was wrong because other types of gambling are just as harmful as pari-mutuel horse race betting? Because other vices are just as dangerous as gambling? Because, when you think about it, a lot of "vices" are not really as dangerous as things considered wholesome? *See Rohan*, 22 N.W.2d 433. The perils of such philosophical disquisitions are why proponents of a statute need only show that "it is practical and reasonable" and need not establish the "abstract symmetry" between different activities that Defendant demands. *Straus*, 222 N.W. at 753; *see also Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 600 (S.D.N.Y. 2016) (rejecting constitutional challenge to the PPPA and noting "'[a] State need not address all aspects of a problem in one fell swoop; policymakers

---

argument here does not concern explicit exemptions, but rather theoretical dangers

may focus on their most pressing concerns'") (quoting *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1668 (2015)).

Defendant argues that the PPPA unconstitutionally failed to anticipate marketing strategies that would become commonplace in the publishing industry circa 2010, such as non-media subscription services. *See* Mot. at 12 (noting that "consumers today can subscribe to a variety of products just like consumers can subscribe to a magazine"). But Defendant fails to establish that non-media subscriptions were not unusual in the late 1980's. *See, e.g.*, NATIONAL LAMPOON'S CHRISTMAS VACATION (Hughes Entertainment/Warner Brothers 1989) (then-contemporary character learns that his annual bonus is a subscription to the "Jelly of the Month Club"). And even assuming the PPPA's generality declined as technology advanced, Defendant unsurprisingly cites to no legal authority for the ill-founded idea that a statute enacted as a permissible general law can transform into an unconstitutional special law due to changing circumstances.[7] *See Bible Believers v. Wayne Cty.*, 2013 WL 2048923, at *13 (E.D. Mich. May 14, 2013) (litigants "may not merely announce a position and leave it to the Court to determine and rationalize the basis of this claim").

---

that it says fall outside the statute.

[7] Concerns over applicability to a changing industry are properly addressed with the legislature, not the judiciary. Indeed, the Michigan legislature enacted an amendment (effective 7/31/16) to prospectively weaken PPPA protections for consumers. But the Complaint seeks to redress Defendant's disclosures prior to 7/31/16, a time when the state of Michigan judged nonconsensual disclosures of a person's PRI, like the disclosures at issue here, to be impermissible.

Defendant's argument that "technology has dramatically shifted historical notions of privacy, and [that] any law that attempts to protect it is tasked with accommodating this ever-changing landscape" (Mot. at 1) is likewise unpersuasive. Defendant might as well argue that a Michigan statute regulating controlled substances in effect in 1988 was automatically rendered unconstitutional as new, more dangerous drugs were developed and hit the streets; or that a law regulating the minimum fare for a ride in a taxi in effect in 1988 was automatically invalidated by the advent of ride-share services. The argument is nonsense. Technology is constantly marching forward – just as it was in 1988 and throughout the annals of history – and neither the Constitution nor logic require perpetual statutory reenactment to "accommodat[e]" the "ever-changing landscape" (*id.*) of modern society. *See, e.g.*, *Lundstrom*, 162 N.W. at 992 (statutes are presumed constitutional).

Technological advancements over the decades, in the consumer data-aggregation and data-brokerage industries in particular, underscore the legitimate need to regulate the data-sharing practices at issue in this case. *See, e.g.*, Compl. ¶¶ 1, 62-64. Indeed, by having sold, rented, and exchanged its customers' PRI on the open market, as alleged in the Complaint, Defendant has unleashed Plaintiffs' and Class members' sensitive personal data into a comprehensive data marketplace for exploitation by innumerable third parties, acutely invading their privacy to an extent not possible at the time the PPPA was enacted in 1988. But the statute's protections

13

applied during the relevant pre-July 31, 2016 time period just the same as they did at the time of its enactment in 1988, and the inexorable technological advances in the consumer data-brokerage industries since 1988 plainly do not render the statute unconstitutional – to the contrary, they present the most compelling case for the statute's application, where its promise of privacy is needed the most.

## II.    Defendant Is Not Entitled to Judgment as a Matter of Law Pursuant to the PPPA's Direct-Marketing Exception

Defendant also moves for judgment on the pleadings on the ground that "[its] disclosures meet the direct marketing exception to the PPPA," found in M.C.L. § 445.1713(d). Mot. at 18. The argument is completely without merit.

Section 445.1713(d) of the PPPA permits a disclosure of a person's PRI where (1) "the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer"; and (2) "[t]he person disclosing the information shall inform the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information."

"Defendant's claim that its conduct falls within a statutory exemption constitutes an affirmative defense to liability, which may only be raised by a pre-motion answer to dismiss if the defense appears on the face of the complaint." *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 453 (S.D.N.Y. 2016). As a threshold matter, Defendant failed to assert its compliance with M.C.L. § 445.1713(d) as an affirmative defense in its Answer (ECF No. 26) to the Complaint. Although the

Answer asserts as affirmative defense number 11 that "[t]he complained of disclosures, if any, meet the VRPA's or Amended VRPA's exceptions," the Answer does not cite to § 445.1713(d), reference the direct-marketing exception, or assert any facts that would give rise to the possible applicability of the exception found in § 445.1713(d), such as facts showing Defendant provided Plaintiffs prior notice of the disclosures of their PRI (let alone where, when, or how such notice was provided) or that the disclosures Defendant made of their PRI were for the exclusive purpose of marketing goods or services directly to them. Because Defendant failed to raise the direct-marketing exception as an affirmative defense in its Answer, Defendant has waived the defense. *See Old Line Life Ins. Co. of Am. v. Garcia*, 418 F.3d 546, 550 (6th Cir. 2005) ("As a general rule, failure to plead an affirmative defense results in a waiver of that defense."). But even if the defense was not waived, Defendant cannot seek judgment on the pleadings on an affirmative defense it has not adequately asserted in its Answer. *See* Fed. R. Civ. P. 8(c)(1); *Taylor v. City of Saginaw*, 2020 WL 376453, at *4 (E.D. Mich. Jan. 23, 2020) (Ludington, J.) (*Twombly* and *Iqbal* standard applicable to pleading an affirmative defense).

Even if the defense was not waived and is capable of being raised in the Motion, the defense "does not appear on the face of the Complaint because Plaintiff[s] specifically allege[] [in the Complaint] that [they] did not receive notice that Defendant was going to disclose [their] personal information." *Ruppel v. Consumers*

15

*Union of United States, Inc.*, 2017 WL 3085365, at *1 (S.D.N.Y. June 12, 2017).

Specifically, the Complaint alleges that, "[p]rior to and at the time Plaintiff[s] subscribed to *Guns & Ammo*, *RifleShooter*, and *Handguns*, [Defendant] did not notify Plaintiff[s] that it discloses the [PRI] of its customers, and Plaintiff[s] ha[ve] never authorized [Defendant] to do so." (Comp. ¶¶ 9-10; *see also id.* (alleging that Plaintiffs were "never provided any written notice that [Defendant] rents, exchanges, or otherwise discloses its customers' [PRI], or any means of opting out"); *id.*, ¶ 69 ("Plaintiffs and the members of the Class did not receive notice before OSG disclosed their [PRI] to third parties."). At this stage of the proceedings, the Court must accept these allegations as true and deny the Motion. *See Ruppel*, 2017 WL 3085365, at *2 (denying motion to dismiss pursuant to Rule 12(b)(6) based on same allegations); *Hearst*, 192 F. Supp. 3d at 454 (same); *Advance Magazine Publishers*, 210 F. Supp. 3d at 589 (same); *see also J.H. Routh*, 246 F.3d at 851.[8]

---

[8] Defendant ignores the Complaint's allegations that Plaintiffs failed to receive notice or an opportunity to opt-out of Defendant's disclosures before they occurred and argues that the direct-marketing exception applies because it "informed its subscribers that it was participating in data sharing, and that individuals could opt out of it," and in support cites to copies of pages from past issues of certain of its magazines that contain the following statement: "OCCASIONALLY, our subscriber list is made available to reputable firms offering goods and services that we believe would be of interest to our readers. If you prefer to be excluded, please send your current address label and a note requesting to be excluded from these promotions to: Outdoor Sportsman Group, 1040 6th Ave., 12th Floor, New York, NY 10018-3703, Attn: Privacy Coordinator" Mot. at 25. But the Complaint does not reference copies of particular issues of Defendant's magazines and thus Defendant cannot rely on the quoted disclosure statement as the basis for seeking judgment on the pleadings.

Moreover, even if Defendant had provided prior notice to Plaintiffs that it would share their PRI with third parties, the Motion still fails because the Complaint alleges several facts demonstrating that Defendant disclosed Plaintiffs' PRI for numerous purposes having nothing to do with marketing goods or services, let alone directly to them. The Complaint alleges that Defendant, "**[t]o supplement its revenues**, [] rents, exchanges, or otherwise discloses its customers' [PRI], as well as myriad other categories of individualized data and demographic information such as age, gender, income, marital status, occupation, and hunting license status—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers." Compl. ¶ 5. "First, [Defendant] disclosed mailing lists containing Plaintiffs' [PRI] to data aggregators and data appenders, **who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to [Defendant]**." *Id.* ¶ 62. "Second, [Defendant] disclosed mailing lists containing Plaintiffs' [PRI] to data cooperatives, **who in turn gave [Defendant] access to their own mailing list databases**." *Id.* ¶ 63. "Third, [Defendant] rented and/or exchanged its mailing lists

_____

Indeed, as previously mentioned, the Complaint specifically alleges that Plaintiffs were not provided any such notice prior to the disclosure of their PRI. *See* Compl. ¶¶ 9-10, 69; *see also, e.g.*, *Hearst*, 192 F. Supp. at 454 (denying motion to dismiss based on direct-marketing exception where complaint's allegations contradicted defendant's assertion that it provided prior notice to plaintiffs). Moreover, the disclosures at issue in this case, as thoroughly discussed below, cannot possibly fall within the direct-

containing Plaintiffs' [PRI]—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, **and organizations soliciting monetary contributions, volunteer work, and votes**." *Id.* ¶ 64. In sum, "[Defendant]'s disclosures of Plaintiffs' [PRI] during the relevant pre-July 30, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—**all in order to increase [Defendant]'s revenue**. **Accordingly, [Defendant]'s disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class**." *Id.* ¶ 72.

These factual allegations clearly demonstrate that Defendant's disclosures were made for various purposes other than for the purpose of "marketing goods or services directly" to Plaintiffs, including to append data to enhance the PRI's value, to obtain lists of prospective customers from other publishers, and to provide a source of potential donations and contributions to charitable organizations and political campaigns. *See* Compl. ¶¶ 5, 62-64, 72. Indeed, as the Motion acknowledges, Plaintiffs "allege that [Defendant] disclosed identifying information of its subscribers to data aggregators, which as explained supra, are companies that collect data from a variety of media and non-media companies and then append it to the discloser's data

marketing exception because they were not made for the "exclusive purpose of

to make it more valuable to the discloser" (Mot. at 19), and that Defendant also "disclosed information of its subscribers to 'data cooperatives' to gain access to the data cooperative[s'] 'mailing list databases'" (*id.* at 21).[9] Based on the factual allegations of the Complaint, there is no basis for the Court to conclude, as a matter of law, that Defendant's disclosures of Plaintiffs' PRI were made for the "**exclusive purpose** of marketing goods or services directly to [Plaintiffs]." *See, e.g.*, *Ruppel*, 2017 WL 3085365, at *2 ("[E]ven if Plaintiff did receive notice that Defendant was going to share his personal information with third parties, the PPPA's safe harbor permits disclosures only 'for the exclusive purpose of marketing goods and services directly to the consumer.' Defendant's supposed disclosures do not satisfy this requirement because Defendant allegedly sells its mailing lists to 'data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and

---

marketing goods or services directly to the consumer," i.e., to Plaintiffs.

[9] Defendant argues that disclosures made for the purpose of marketing goods or services (and specifically magazine subscriptions) to prospective customers obtained from the mailing lists Defendant gained access to from data cooperatives, in exchange for disclosing to the cooperatives all of its customers' PRI, somehow fall within the exception for disclosures made "for the exclusive purpose of marketing goods or services directly to the consumer." Mot. at 22. The argument is baseless. For one thing, the "consumer" within the meaning of the exception is plainly the person's whose PRI has been disclosed by the Defendant, not a prospective customer who has never before interacted with the Defendant. Moreover, the Complaint alleges that Defendant's disclosures to data cooperatives were made for the purpose of obtaining lists of prospective customers – and thus not "for the exclusive purpose" of marketing goods and services to those customers. And the Complaint alleges no facts suggesting that Defendant actually attempted to market "goods or services," including but not

solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts.' Defendant's contention is thus contradicted by Plaintiff's allegations[.]"); *Advance Magazine Publishers*, 210 F. Supp. 3d at 589 ("The allegations thus include dissemination to data miners to enhance the value of the PRI, which does not neatly fall within the exception for disclosure with the exclusive purpose of marketing directly to a consumer."); *see also Newell v. Cent. Michigan Univ. Bd. of Trustees*, 461 F. Supp. 3d 589, 595 (E.D. Mich. 2020) ("[Rule] 12(c) motions address the complaint on the pleadings, rather than after discovery has occurred. Courts must view the pleadings in the 'light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law.'") (Ludington, J.).

Indeed, the Sixth Circuit has noted that disclosures to data aggregators and cooperatives, like those alleged here (*see* Compl. ¶¶ 62-63) do not fall within the ambit of the exemption:

> Just to be clear before moving on, Coulter-Owens is not complaining about Time's selling her information under its "list rental business," which would fall within the "direct marketing exception" of § 1713(d). Coulter-Owens is suing Time for submitting this order information (name, address, and magazine choice) into Acxiom's and Wiland's giant stew of personal information already in their possession, such as her gender, race, age, education, employment, political affiliation, hobbies, etc., furthering a larger dossier on her. For example, Time submits her name, current address, and that she just subscribed to Time magazine,

limited to subscriptions to its publications, to the persons whose PRI Defendant obtained from the data-cooperatives in exchange for its existing customers' PRI.

20

and gets back (hypothetically) a dossier of her age, gender, race, education level, employment history, or other hobbies and interests. With this information, Time places her on a specific list that it can sell to a business, charity, or political group interested in people with her same interests. It is this disclosure of her magazine-subscription information that she claims violates the PPPA.

*Coulter-Owens v. Time Inc.*, 695 F. App'x 117, 120 (6th Cir. 2017).

Confronted with the Complaint's allegations that it sold, rented, and otherwise disclosed Plaintiffs' PRI to political, non-profit, and other charitable organizations, Defendant argues that "[s]uch list rentals…fall within the direct marketing exception of the PPPA" because "**[a]ny disclosures** via the list rental business are done for the purpose of marketing to the discloser's customers." Mot. at 23. In other words, Defendant says that any rental of Plaintiffs' PRI to any third party is exempt from the statute because it necessarily was made "for the exclusive purpose of marketing goods or services directly to [Plaintiffs]." That cannot possibly be correct. Defendant's disclosures of Plaintiffs' PRI to third parties who do not even sell goods or services – such as charitable and political organizations that are looking for contributions and donations, in exchange for the provision of no goods or services – plainly do fall within the exception the Motion attempts to invoke, even under Defendant's strained (and clearly erroneous) interpretation of the phrase "to the consumer." *See, e.g.*, *Ruppel*, 2017 WL 3085365, at *2. There is thus no merit in Defendant's contention that "the alleged disclosure of information to charity or political organizations…is also a disclosure for the exclusive purpose of marketing because such entities are

21

utilizing the information to 'promote' a service." Mot. at 24. Defendant does not even attempt to articulate the "service" marketed by charitable or political organizations who seek only contributions and donations from the persons they contact.

Notwithstanding the well-pled allegations recited above, Defendant says that it disclosed Plaintiffs' PRI "for the exclusive purpose of marketing goods and services directly to [them]" because "the purpose of marketing is to earn revenue," and "any revenue allegedly earned by KSE by enhancing its own data will be via increased sales of its magazines to existing customers, *i.e.*, via marketing." Mot. at 19; *see also id.* at 21 (arguing that "'marketing' as is used in § 445.1713(d) includes any motivation by KSE, as alleged by Plaintiffs, to earn revenue"). That makes no sense. The exception does not apply to any disclosure made merely for the purpose of "marketing," or for "earn[ing] revenue," but rather only applies to disclosures made "for the **exclusive** purpose of marketing **goods or services directly to the consumer**," i.e., to Plaintiff. *See* M.C.L. § 445.1713(d). But here, as outlined above, the Complaint specifically alleges that Defendant disclosed Plaintiffs' PRI to third parties for various purposes having nothing to do with marketing (or "selling") goods or services, much less to Plaintiffs – including for such purposes as enhancing the value of its lists, obtaining lists of prospective customers from other publishers, providing a source of potential donations and contributions to charitable organizations and political campaigns, among others.

22

Defendant argues that "KSE allegedly undertaking the disclosures for the exclusive purpose of making a profit is the same as KSE undertaking the disclosures for the exclusive purpose of marketing because for-profit companies market for the exclusive purpose of making a profit." Mot. at 20. Although difficult to follow, this argument appears to rest on two logical fallacies: First, that because the purpose of marketing is to make money, anything that makes money constitutes marketing; and second, that because Defendant made money disclosing Plaintiffs' PRI, it means that Defendant disclosed Plaintiffs' PRI for the exclusive purpose of marketing goods and services directly to them. The argument is frivolous. In reality, the Complaint alleges that Defendant sold and rented Plaintiffs' PRI to data-cooperatives, data appenders, charitable organizations, and others for the exclusive purpose of making money from selling and renting their data, without any intention to market goods or services to them, much less directly to them. The exception thus does not apply.

According to Defendant, the direct-marketing exception applies because "[m]arketing is not a charitable enterprise," and "is done expressly to make a profit or promote a service." Mot. at 20. But if so, it only proves Plaintiffs' point that Defendant's alleged disclosures of their PRI to <u>charitable</u> organizations cannot possibly satisfy the statutory exception for disclosures made exclusively for purposes of "<u>marketing</u> goods and services directly to the consumer." M.C.L. § 445.1713(d).

23

The direct-marketing exception is sensibly intended to permit companies to disclose their customers' PRI to vendors, such as printers of advertisements and brochures and the like, who assist with the preparation of materials sent to the company's customers to solicit their purchase of the goods and/or services advertised therein. The Complaint here, on the other hand, alleges that Defendant sold, rented, exchanged, and otherwise disclosed Plaintiffs' PRI to any third-party interested in purchasing it, including charitable and political organizations that neither market nor sell goods or services but rather solicit donations and contributions, that Defendant disclosed Plaintiffs' PRI to data appenders to enhance the data and send it back to Defendant for the purpose of making more money from Defendant's subsequent downstream sales of the enhanced data to other third parties, and that Defendant sold, rented, exchanged, and otherwise disclosed Plaintiffs' PRI to data cooperatives, who then provided Defendant with the PRI of prospective customers who subscribed to other publishers' publications. Any one of these types of disclosures is a far cry from disclosures for the "exclusive purpose of [Defendant] marketing goods and services directly to [Plaintiffs]" – the only type of disclosure the exception even potentially applies to. *See* M.C.L. § 445.1713(d). The direct-marketing exception plainly does not apply based on the facts alleged in the Complaint, and the Motion should be denied.

Defendant's "analysis" of *Greer v. Motion Water Sports*, 2018 WL 1907449 (M.D. Tenn. Apr. 23, 2018) (Mot. at 20) is unavailing. Even accepting Defendant's

24

recitation of the decision's conclusion as correct – that it "interpret[ed]…'marketing' as 'the business of selling a product'," which "precluded the plaintiff's claim on the pleadings based on that definition" (Mot. at 21) – this only further confirms that the direct-marketing exception does not apply here. Again, the Complaint alleges that Defendant disclosed Plaintiffs' PRI for various purposes having nothing to do with "marketing" goods or services directly to Plaintiffs (or "selling a product" directly to Plaintiffs), including for the purposes of making money from third party's rentals and purchases of this data; obtaining enhanced, appended lists that were more valuable and could be sold for money to other third parties; obtaining prospective subscribers' PRI from other publishers in exchange for disclosing to those publishers its existing customers' PRI; and enabling charitable and political outfits to solicit donations and contributions to their own organizations and campaigns. These allegations must be accepted as true in deciding the Motion, and they clearly prevent entry of judgment in favor of Defendant based on the PPPA's direct-marketing exception.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: September 9, 2022                     Respectfully submitted,

                                             */s/ E. Powell Miller*
                                             E. Powell Miller (P39487)
                                             THE MILLER LAW FIRM, P.C.
                                             950 W. University Drive, Suite 300
                                             Rochester, MI 48307
                                             Tel: 248-841-2200
                                             epm@millerlawpc.com

Sharon S. Almonrode (P33938)
ssa@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta (P85228)
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
David W. Hall
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
dhall@hedinhall.com

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 9, 2022, I electronically filed the foregoing

documents using the Court's electronic filing system, which will notify all counsel of

record authorized to receive such filings.


<u>*/s/ E. Powell Miller*</u>
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com